GRAND RAPIDS AND INDIANA RAILROAD COMPANY v. HELEN
S. HUNTLEY.

*Railway negligence—Speed of trains—Defective axle—Physician's
testimony—Liability of passenger carriers—Railway companies
do not warrant their cars.*

The speed of trains is not a matter for scientific testimony, but it
cannot be shown from the opinions of passengers observing only
from the inside, unless their experience and observation is such
as to make their judgment reliable.

More than ordinary speed is not necessarily evidence of negligence
in running a train.

Testimony as to the speed of trains should not be merely relative,
without some standard of rapidity, but should, at least approxi-
mately, show the real rate and show that it was unsafe, before
the question whether it was negligent can be left to the jury.

Ordinary railway travelers are not presumed to form while riding
such habits of observation as will make their opinion as to the
speed of trains reliable.

In an action for railway injury defects in the track at other times
and places than those of the accident cannot be shown in proof
of negligence contributing to the injury.

Actual negligence must be proved; it will not be implied or pre-
sumed.

Testimony as to the cost of rolling-stock is irrelevant to the ques-
tion of negligent speed in the running of passenger trains.

An experienced conductor is presumed to know whether ties are fit
for use.

A physician cannot testify to his opinion as to what ails a patient
where it is not the result of his own examination nor based on
facts in proof nor given in answer to hypothetical questions
based on facts.

Scientific opinions can only be founded on established facts.

Exclamations of pain are properly excluded from evidence in an
action for personal injury where they were made at a medical
examination conducted after the controversy arose for the pur-
pose of obtaining testimony and not for treatment.

Whether the structure of a railroad is such as to warrant fast travel
is not usually a question for ordinary witnesses.

Carriers of freight are liable for any damage not caused by the act
of God or of the public enemy, and are insurers; but carriers
of passengers are liable only for injuries resulting from their
actual negligence or that of their employees.

38 MICH.—68.

Railway passenger carriers fulfill their duty if they furnish and conduct their road in the manner generally found and believed to be safe by prudent railway companies.

A purchaser has a right to assume that goods bought from a reputable dealer are in good condition if they seem to be so on such inspection as is reasonable and practicable.

Railway companies buying rolling stock from reputable manufacturers are not chargeable with negligence in accepting material on such inspection as is usual and practicable, without discovering concealed defects; they cannot be held to warrant their cars.

Error to Allegan. Submitted Feb. 1. Decided April 3.

TRESPASS ON THE CASE. Defendant brings error.

*Hughes, O'Brien & Smiley* and *N. A. Earle* for plaintiff in error. A physician's testimony as to the condition of a person must be based on actual knowledge, *Muldowney v. Ill. Cent. R. R.*, 39 Ia., 622; *Moore v. State*, 17 Ohio St,, 521; *Rowell v. Lowell*, 11 Gray, 420; exclamations of pain, while admissible as tending to show the actual condition of the person making them (*Elliott v. Van Buren*, 33 Mich., 49; *Johnson v. McKee*, 27 Mich., 471; *Hyatt v. Adams*, 16 Mich., 200) must be such as are caused by actual suffering and not brought out to be used as evidence, 1 Greenl. Ev., § 102; *Rex v. Foster*, 6 C. & P., 325; *Bacon v. Charlton*, 7 Cush., 581; *Reed v. N. Y. Cent. R. R.*, 45 N. Y., 574; a person on board a train cannot give a reliable opinion as to its speed without skill and experience, Shearman & Redf. Negl., § 478; *McKonkey v. C. B. & Q. R. R.*, 40 Ia., 205; *Brown v. Buffalo & State Line R. R.*, 22 N. Y., 191; an experienced conductor is competent to testify as to the condition of ties, *Jeffersonville R. R. v. Lanham*, 27 Ind., 171; a railway company is not responsible for defects in machinery obtained of reliable manufacturers, and carefully examined without discovering them, *Ardesco Oil Co. v. Gilson*, 63 Penn. St., 146; *Ingalls v. Bills*, 9 Metc., 1; *Ill. Cent. R. R. v. Phillips*, 49 Ill., 234; *Stevens v. Armstrong*, 2 Seld., 435; *Painter v. Mayor*, 46 Penn. St., 213; *Boswell v. Laird*, 8 Cal., 469.

*Philip Padgham* for defendant in error. Exclamations of. pain are admissible to show one's condition, *Caldwell v. Murphy*, 11 N. Y., 416; a passenger can demand the highest possible degree of care without reference to the kind of train he takes, *Ind. & St. Louis R. R. v. Horst*, 93 U. S., 291; a railway company is responsible for defects in its carriages even if it bought them from skillful manufacturers, *Sharp v. Grey*, 9 Bing., 457; *Grote v. Chester &c. Ry.*, 2 Exch., 251; *Francis v. Cockrell*, 5 Q. B., 184; id., 500; *Hegeman v. Western R. R. Corporation*, 13 N. Y., 9; Angell Com. Carriers, § 523; 2 Kent's Com. [7th ed.], 602; railroad companies are held to the utmost care in providing suitable and proper carriages, engines, tracks and agents, *Warren v. Fitchburg R. R. Co.*, 8 Allen, 230; *McElory v. Nashua &c. R. R.*, 4 Cush., 400; *Schopman v. Bost. & Worcester R. R.*, 9 Cush., 24; *Gonzales v. N. Y. & Harlem R. R. Co.*, 39 How. Pr., 407; *Reed v. N. Y. Cent. R. R.*, 56 Barb., 493; *Toledo, Wabash & Western R. R. v. Apperson*, 49 Ill., 480.

CAMPBELL, C. J. Suit was brought by Mrs. Huntley for personal injuries suffered on the 5th day of November, 1874, by reason of an accident caused by a passenger car being thrown from the track and upset. The testimony showed that the mischief was caused by the breaking of an axle containing a large flaw, within the wheel or near its edge. Those witnesses who made any actual examination found the flaw entirely within the axle, and covered by a small thickness of sound metal. The suit was tried in April, 1877, about two years and a half after the accident. Mrs. Huntley was injured in the shoulder, and claimed that the injury was permanent.

Testimony was introduced bearing upon the condition of the cars and track, and the speed of the train, as well as concerning the character of the injury. The principal questions arise · upon the medical testimony and upon the charge; although some other points are presented.

We do not consider it necessary to dwell minutely on the testimony of speed. It was held in *D. & M. Rw. Co. v. Van Steinberg*, 17 Mich., 99, that questions touching the speed of trains were not properly scientific inquiries, and were not beyond the competency of ordinary witnesses who had means and habits of observation. In this case it may be doubted whether the witnesses were all near enough to observe, and some of them gave no such data as to indicate what the speed was except as to its comparison with ordinary rates. It would be going too far to hold that any increase over ordinary speed was evidence of danger or of negligence. The testimony should at least show approximately what the real rate was, and that it was faster than safety warranted, before the case should be allowed to go to the jury on such a point. The well known liability of all common observers to be deceived as to the rate of speed of heavy trains, renders it necessary to guard as far as possible against vague testimony, which cannot be directly met or corroborated by the proof of persons having actual knowledge on the subject. Testimony of actual speed is tangible, whatever may be the value of the opinions of particular observers; but opinions on relative speed, without some standard of rapidity are of no value by themselves. In regard to opinions of persons riding in the cars, and not observing from the outside, we are not prepared to say they may not be received, but we think they should be excluded unless the witnesses first show such extended experience and observation as to qualify them for forming such opinions as would be reliable. It is not presumable that ordinary railway travelers usually form such habits.

We are also of opinion that no defects in the track could be relied on to show negligence contributing to the accident except those existing where the track was injured or displaced, and that testimony as to the condition of the road away from the scene of the injury was improper to make out a cause of action, and could only tend to

raise false issues. The testimony should be confined to the time as well as place of the accident.

We think there was no error in excluding testimony of the cost of Pullman cars and other stock. The law will not allow negligence to be presumed without proof of actual negligence. All speculations as to the antecedent probabilities must yield to the facts; and if such speculations can be indulged in, there would be no end to inquiry. It is easy to imagine a great variety of circumstances which might induce some persons to take more care than they would under others; but it would be a very strained presumption that carriers of passengers must be expected to care more for the safety of cars, expensive or inexpensive, than for the lives and limbs of those who travel on their trains.

The fitness of ties for use is a matter which a conductor of several years' standing must be presumed to understand. His position is a very responsible one, and if he has not familiarized himself with such things as are customary in railway construction, he can hardly have used his eyes to much purpose.

The nature of the injury which Mrs. Huntley suffered became a leading subject of discussion. There was no apparent dispute concerning the original suffering of a slight wound on the head and the dislocation of a shoulder, which was at once set. The chief dispute was whether this dislocation involved any permanent injury, and also whether there was any injury to the spinal column which led to lasting trouble.

Dr. Turner attended her a short time after the injury, and about ten days, after which she was left in charge of Dr. Ball. He visited her again about the time suit was begun, for the purpose of making an examination, and again about three weeks before the trial or more than a year after the second visit. In each of the two latter visits he and another physician, Dr. Ball, with Dr. Andrews, examined her without removing the cloth-

ing from her back or shoulder and, as the testimony seems to show, made the examination by measuring the arm and shoulder in different positions and pressing on the spine at various points. He asked no question about the spine, but she made complaint of pain above the shoulders.

Upon this testimony of examinations Dr. Turner was allowed to state what in his opinion ailed Mrs. Huntley, and whether it was permanent. His conclusion was that she received a spinal injury at the time of the accident by a sprain—such a concussion as produced laceration and effusion of blood, resulting in a pressure on the spinal cord interfering with the functions of the nerve fluid, and preventing the assimilation of food. That she had a good appetite but could not digest her food, which results in emaciation; that she had urinary difficulties which is always the case, and that was the condition he thought the woman was in. That the difficulty was permanent.

There is probably some error in taking down some parts of the testimony, which as it reads on the record is rather blind and incoherent. But we have stated it as it was evidently designed to appear.

We think this testimony was inadmissible. No portion of it was the result of the witness' conclusions from his own examination, which, according to his statement on the stand, was purely superficial and without inquiry as to any of the injuries or maladies beyond the local injury. He was not her attending physician for purposes of treatment, nor counseling physician for any such purpose, nor did he examine her for purposes of treatment, but merely as auxiliary to a law-suit. The case shows very fully from his own statement that he had no means of knowing or suspecting from any treatment or examination whether there was any spinal, or dyspeptic, or urinary difficulty, or of what nature, or when discovered or originating, or how caused. He does not state on what he based his conclusions, but he does

show that he had no knowledge to base them on. They are not scientific opinions—which can only be founded on established facts. They do not purport to be hypothetical, and were not given in answer to any hypothesis founded on evidence. There is no testimony set forth in the record bearing on them at all. As the case stands his views are mere guesses upon no basis of facts. They are also objectionable as covering disputed facts on which it was for the jury and not for experts to decide.

Dr. Ball, who was present with Turner on both of the latter examinations testifies that he was not desired to make and did not make any examination beyond the shoulder, and knew of no further examination. He was asked and allowed to answer what expression Mrs. Huntley made at the last examination, three weeks before trial, and answered that she complained of pain, and that it hurt her. He also swore that the examination was for the purpose of giving testimony. His evidence further was not very strongly corroborative of Dr. Turner's view.

The question is raised on this whether the expressions of pain were admissible as proof of actual suffering.

It has been held several times by this court that statements of pain and of its locality were exceptions to the rule excluding hearsay evidence. *Hyatt v. Adams*, 16 Mich., 180; *Johnson v. McKee*, 27 Mich., 471; *Elliott v. Van Buren*, 33 Mich., 49.

These statements are admitted only upon the ground that they are the natural and ordinary accompaniments and expressions of suffering. It would be impossible in most cases to know of the existence or extent or character of pain without them. They are received therefore as acts rather than declarations, and admitted from necessity. The rule which admits declarations of present suffering has never been extended so as to include declarations either of past suffering or of the causes in the past of such suffering, so as to make such statements

proof of the facts. Declarations concerning the past are narratives and not acts. Exclamations of suffering may be, and if honest are, parts of the occurrence itself.

It is difficult to lay down any very clear line of admission or exclusion where the exclamation refers to the feelings of the moment. But we think it would not be safe to receive such testimony in any case where it is not the natural and ordinary expression of pain, called out without purpose, or in the course of medical treatment. The unstudied expressions of daily life, or the statements on which a medical adviser is expected to act, and which if feigned he should have skill enough to subject to some test of truth, stand on a footing which removes them in general from suspicion.

But we cannot think it safe to receive such statements which are made for the very purpose of getting up testimony, and not under ordinary circumstances. The physicians here were not called in to aid or give medical treatment. The case had been relinquished long before as requiring no further attendance. They were sent for merely to enable the plaintiff below to prove her case. The whole course of the plaintiff was taken to no other end. She had in her mind just what expressions her cause required. They were therefore made under a strong temptation to feign suffering if dishonest, and a hardly less strong tendency if honest to imagine or exaggerate it. The purpose of the examination removed the ordinary safeguards which furnish the only reason for receiving declarations which bear in a party's own favor.

The general rule in regard to other classes of hearsay evidence and statements admitted upon the same principle is that they must have been made *ante litem motam*, which is interpreted to mean not merely before suit brought, but before the controversy exists upon the facts. *Stockton v. Williams*, Walker's Ch., 120: 1 Doug. (Mich.), 546 (citing the *Berkeley Peerage Case*, 4 Campb., 401; *Richards v. Bassett*, 10 B. & C., 657; *Doe d. Tilman v. Tarver*, R. & M., 141; *Monkton v. At. Gen.*, 2

Russ. & Myl., 160; *Whitelocke v. Baker*, 13 Ves., 514). The language of Lord Eldon in *Whitelocke v. Baker* has met with general acquiescence. He says: "All are admitted upon the principle, that they are the natural effusions of a party, who must know the truth; and who speaks upon an occasion, when his mind stands in an even position, without any temptation to exceed or fall short of the truth." p. 514.

It is not necessary to consider whether there may not be properly received in some cases the natural and usual expressions of pain made under circumstances free from suspicion, even *post litem motam*. The case must at least be a very plain one which will permit this. The present controversy presents no such difficulty. The physicians were called in, not to give medical aid but to make up medical testimony; and the declarations were made to them while engaged in that work. It would be difficult to find a case more plainly within the mischief of the excluding rule.

The principal remaining questions arise out of the rules of liability established by the charge.

The primary cause of the accident was the broken axle. Some stress seems also to have been laid on the condition of the track and the rate of speed. So far as appears upon the record, we have not discovered any proper evidence to authorize these matters to be considered. There is no testimony from such persons as are qualified to give opinions on the subject that either the condition of the road or the speed indicated negligence. Whether the structure of a road is such as to warrant fast travel is not a question which usually belongs to ordinary witnesses, and it would be dangerous to allow a jury to act on its own suspicions or prejudices in such a matter. The road, if in such a condition as would be regarded as safe by railroad men of usual intelligence and experience, could not be complained of for any possible deficiencies which would not be regarded by com-

38 MICH.—69.

petent persons as existing, nor could the rate of speed be properly held excessive without similar evidence from men of experience. It is a matter of daily occurrence in many parts of the country, and of occasional occurrence everywhere, for cars to be run at very high rates of speed on railway tracks. No particular rate can be assumed, without proof, to be dangerous.

The main question, however, relates to responsibility for the condition of the axle. It was held by the court below that no diligence or care in the railroad company could exempt them from want of care in the manufacturers of the cars and axles.

This doctrine is we think entirely incorrect. Carriers of freight are liable whether careful or not, for any act or damage not caused by the act of God or of the public enemy. Their liability, therefore, does not arise from negligence or want of care. It arises from their failure to make an absolutely safe carriage and delivery, which they insure by their undertaking. The analogies of carriers of freight have nothing to do with passenger carriers. These are liable only when there has been actual negligence of themselves or their servants. If they exercise their functions in the same way with prudent railway companies generally, and furnish their road and run it in the customary manner which is generally found and believed to be safe and prudent, they do all that is incumbent upon them. *M. C. R. R. v. Coleman*, 28 Mich., 440; *G. R. & I. R. R. v. Judson*, 34 Mich., 506; *Ft. Wayne, J. & S. R. R. v. Gildersleeve*, 33 Mich., 133; *M. C. R. R. v. Dolan*, 32 Mich., 510. This general doctrine the court below laid down very clearly, but qualified it so as to make them absolutely responsible for the omissions or lack of skill or attention of the manufacturers from whom they made their purchases of stock, however high in standing and reputation as reliable persons.

There is no principle of law which places such manufacturers in the position of agents or servants of their

customers. The law does not contemplate that railroad companies will in general make their own cars or engines, and · they purchase them in the market, of persons supposed to be competent dealers, just as they buy their other articles. All that they can reasonably be expected to do is to purchase such cars and other necessaries as they have reason to believe will be safe and proper, giving them such inspection as is usual and practicable as they buy them. When they make such an examination, and discover no defects, they do all that is practicable, and it is no neglect to omit attempting what is impracticable. They have a right to assume that a dealer of good repute has also used such care as was incumbent on him, and that the articles purchased of him which seem right are right in fact. Any other rule would make them liable for what is not negligence, and put them practically on the footing of insurers. The law has never attempted to hold passenger carriers for anything which they could not avoid by their own diligence.

The case of *Richardson v. Great Eastern Railway Co.*, L. R. 1 C. P. Div. 342 (Court of Appeals), is quite in point and establishes the doctrine as it has been fixed by the general understanding since the carrying of passengers has been the subject of legal discussion. That was a passenger case, depending on the doctrine of negligence as applied to defective trucks. The axle of a truck belonging to another company, brought on the line of the respondents to be forwarded, was broken by reason of a flaw which might have been discovered by a minute examination, but which was not discovered in fact by such an examination as was customary and reasonably practicable. It was held no negligence could be imputed for not making a more minute examination than was made. In that case the court also held that it was not within the province of a jury to lay down rules after their own opinion, which imposed - duties beyond the usual practice of prudent railways. See also *Daniel v. Metropolitan Railway Co.*, L. R. 5 H. of L., 45, upon

the right of a railway company to assume there is no negligence in others over whom they exercise no control.

The injustice and illegality of holding passenger carriers to anything like a warranty of their carriages was very fully discussed and asserted in *Readhead v. Midland Rw. Co.*, L. R. 4 Q. B., 379. The New York cases which were relied on upon the argument of the present cause were considered in the light of a large number of decisions, and disapproved, as we think correctly. They entirely ignore the true ground of responsibility as depending on the actual negligence of the carrier. There is no such thing as implied negligence, when there is none in fact.

We think the judgment erroneous, and it must be reversed with costs and a new trial be granted.

The other Justices concurred.