MAYER *v.* DETROIT, YPSILANTI, ANN ARBOR & JACKSON RAILWAY.

1. MASTER AND SERVANT—INJURIES TO SERVANT—ACTION—ISSUES—STREET RAILROADS.

In an action by a motorman against a street-railroad company for injuries, where the negligence declared on is failure to equip the car with "sand boxes and sand," the question whether there was a pail of sand and a shovel on the car is immaterial.

2. SAME—EVIDENCE—ADMISSIBILITY—OTHER ACCIDENTS.

It being claimed that the injury resulted from the motorman's losing control of his car for want of sand to use on a grade, evidence that other runaways had occurred on the same hill, under like circumstances, from the same cause, is competent.

3. SAME—QUESTIONS—OBJECTIONS.

Exclusion of a question asked a witness, as to how many other cars he had known of having run away on the hill, furnishes

no basis for the claim that plaintiff was prevented from showing other similar runaways from similar causes upon the same portion of the road, where the witness was not a street railroad man and showed no special knowledge of the causes or circumstances of the previous runaways.

4. SAME — NEGLIGENCE — STREET RAILROADS — EQUIPMENT—SUFFICIENCY OF EVIDENCE.

Evidence examined, and *held,* sufficient to show that defendant was negligent in not equipping its cars with automatic sand boxes. CARPENTER and GRANT, JJ., dissenting.

5. SAME—MASTER'S DUTY—ORDINARY CARE.

A street-railroad company owes its motormen the duty of furnishing those appliances which, measured by the standard of good railroading as actually conducted, can be said to be reasonably safe, and is not bound to equip its cars with every possible appliance to insure safety.

6. SAME—ACTIONS—INSTRUCTIONS.

Where a motorman was, before being placed in charge of a car, instructed in the usual manner and for the usual time considered necessary to enable motormen to run a car, and was trained to the satisfaction of his instructors, who are not claimed to have been incompetent, in all the moves necessary to start and control a car at all points, it was error for the court, in an action for injuries to the motorman, to charge that he was only a motorman, without other training or experience than what was merely sufficient to start and stop the car, and possessed no mechanical training, but was an inexperienced young man recently from the country.

7. SAME—ASSUMPTION OF RISK.

A motorman, who had been working on a street railroad for about six months, and fully understood the ordinary operation of his car, and was familiar with sand boxes and sand and the purpose for which the sand was used, and knew the danger of its absence, and failed to use the sand provided him when he saw the slippery condition of the track over which he was running, assumed the risk of his car's running away on a down grade.

Error to Washtenaw; Kinne, J. Submitted October 6, 1905. (Docket No. 15.) Decided December 30, 1905.

Case by Albert F. Mayer against the Detroit, Ypsilanti, Ann Arbor & Jackson Railway for personal injuries.

There was judgment for plaintiff, and defendant brings error. Reversed.

Plaintiff, while in defendant's employ as motorman, on January 7, 1902, was very seriously injured. The defendant was found guilty of negligence, and a substantial verdict recovered. Defendant's street railway line in the city of Ann Arbor runs northerly from Catherine street, down Detroit street, with its northerly terminus near the Michigan Central depot. There is a gradual incline from Catherine street, down Detroit street, to a point west of the Michigan Central depot, which point is called "Bridge Point" in the record, and is a short distance south of the bridge over the railroad tracks. At that point the road turns abruptly to the right down a steep grade to within a short distance of the depot. Opposite its terminus, and a few feet therefrom, is a stone pillar of the depot. The average grade from Catherine street to Bridge Point is 2.5 per cent. In some places it is nearly level; in others the grade varies from 9 inches to 5.15 inches per 100 feet. The weather previous to January 7th had been cold. On that day it was sufficiently warm to melt snow upon the streets. There was no snow or ice upon the rails. Towards noon the frost came out of the rails, causing slippery, or, as the railroad men called it, "greasy tracks." No difficulty had been experienced in going over this street until the trip before that in which the plaintiff was injured. Plaintiff's run commenced at 8 o'clock a. m. from defendant's car barns, and continued until 4:40 p. m. Each trip took 40 minutes. The accident occurred about 10 minutes past 12. There was nothing in the condition of the tracks in the morning to cause apprehension. Plaintiff testified that it got more frosty and slippery as the day went on. A car had gone down and back just before the plaintiff went down and was injured. The cars passed each other on a switch near Catherine street. There are several cross-streets between Catherine and Bridge Point, among which are Division, Kingsley,

and Fuller streets; Fuller is about 350 feet from Bridge Point, and Kingsley 1,150 feet. The record fails to show the distance from Division street to the point. Plaintiff testified:

"I was going down Detroit street slowly. When near Division street my car began to slide. I released my brakes and put on my reverse current, threw my reverse lever, put on the reverse current, and stopped the car somewheres about Division street—somewheres in that vicinity between Fuller and Division—and I shut off the current, but did not change the reverse lever, but left it in proper position to reverse again if necessary; left the car to roll slowly down the hill, gathering up my brakes, but it began to slide again, and I reversed. I began to slide the last time somewheres about Fuller street. I reversed again, but the rail was so slippery that it was impossible to stop the car. * * *

" Q. Did you stop the car?

"A. I did not.

" Q. Go on and state how it happened, and what further occurred.

"A. It skidded all the way down. The car skidded all the way down to the depot down hill.

" Q. What do you mean by that?

"A. It slid all the way down.

" Q. All the way down where?

"A. All the way down as far as I knew anything about it.

" Q. Do you know whether it turned to go down to the depot?

"A. It did.

" Q. Did it go down that hill?

"A. It did.

" Q. Were you able to stop it when it got to the top of the hill going down to the depot?

"A. No, sir."

He also testified that by means of his reverse current he stopped the car after it had skidded a little ways, and ran it back a short distance before starting again down the incline; that he applied the brakes as soon as the car started the second time, and let it roll slowly down with the brakes on; that after going from two to four rods he became satisfied that the brakes were not going to hold

the car, and he then threw off the brakes and again reversed. The car ran off at the end of the track and struck the stone pillar, badly demolishing the car and severely injuring plaintiff.

The grounds of negligence alleged in the declaration are:

1. Failure to keep its tracks free from ice, snow, and frost.

2. Failure to equip its cars with sand boxes and sand.

3. Failure to warn and instruct the plaintiff against the dangers attendant upon running cars when the tracks were covered with ice and snow, and in assuring him that there was no danger in running the car down grade when the track was thus covered.

4. The failure to equip the car with proper brakes and other appliances for stopping it.

The first and fourth grounds of negligence were properly eliminated from the consideration of the jury, as there was no evidence to sustain them.

The evidence on the part of the plaintiff shows that on the day in question the track became suddenly unusually slippery or "greasy." Plaintiff testified that he had no trouble in holding his car at any other time. The motorman who made the trip 30 minutes before, and who had been in the employ of the company about ten months, testified:

"I never saw them in worse condition.    *    *    *

"Q. When did you first notice this slippery condition caused by the frost coming out of the rails; that is, what time of the day?

"A. I noticed that it was especially bad the trip before Mr. Mayer got hurt; that is, 30 minutes before.

"Q. Had you noticed it before then that day?

"A. I had not noticed it enough to be alarmed about it. It is a condition that comes on very quickly. The condition was not the same on all the rails on that part of our route. It was only particularly slippery from Kingsley street to the depot. On my trip before Mayer was hurt, I made the trip, by being careful, without any accident. I had never run off the end of the track at the depot."

Another motorman, who made the trip immediately preceding that of the plaintiff, testified: "It was the worst track I ever saw, slippery."

The case was submitted to the jury upon the second and third grounds of negligence. Upon the second ground of negligence the court instructed the jury as follows:

" The negligence of which the plaintiff complains, and which he charges against the defendant as causing this accident, is the failure of the defendant to provide its railway cars with sand boxes or the appliances for the casting of sand upon the rails of said railway track when the rails were slippery, and when there was danger by reason of the wheels sliding and thereby losing control of the car. * * * It is the duty of the defendant, in view of the grade of its roadbed and the liability of its tracks to become slippery in certain conditions of the weather, to use reasonable care and diligence to furnish its cars with such devises and appliances for controlling the speed of its cars as good railroading demands; and if you shall find from the evidence in this case that the defendant failed to do so, then it would be guilty of negligence. It was the duty of the defendant to use reasonable care and diligence to provide for the use of the plaintiff such appliances as were in common use upon other roads as would be adequate to control the speed of its cars at any point on its road in the city of Ann Arbor during any conditions of its track which the defendant knew, or by the exercise of ordinary care and diligence ought to have known, was liable to exist; and if you shall find from the evidence in this case that the defendant failed to do so, then it would be guilty of negligence."

Upon the third ground of negligence the court instructed the jury as follows:

" In this case, if you should find that from the evidence that the danger and risk which caused this accident was as open and apparent to the plaintiff as it was to the defendant, and that he remained in the employ and service of the defendant with this knowledge of this risk and danger, then he cannot be heard to complain, and must be regarded as having assumed these dangers, and he cannot recover. It appears, however, that he was only a motorman without other training or experience or knowl-

edge than what was merely sufficient to start and run and to stop the car, and he possessed no mechanical or other scientific knowledge or training, but was an inexperienced young man recently from the country.    Under those circumstances I instruct you as follows:

"If you find from the evidence that he became uneasy and solicitous about his ability as a motorman to properly handle and hold the cars without sand boxes or other like appliances, and that on the morning of the accident he went to the superintendent of the company and communicated his fears, and that the superintendent of the company assured him that there was no danger if due care was exercised; and if you further find from the evidence that he relied upon this information and assurance of the superintendent, and that he did so because he believed he could safely depend upon the opinion and judgment of the superintendent, whom he believed to possess knowledge superior to his own, then it seems to me, and I so instruct you, that the defendant company ought not to be allowed to urge against the plaintiff that he has assumed the risks and dangers which he sought to have avoided, and which he might have escaped but for the assurance of the superior officer of the railroad company to whom he went for counsel and for safety to himself and the public."

Any further facts so far as essential will be stated in connection with the discussion and determination of the legal questions.

*Corliss, Leete & Joslyn* (*Ray B. Morgan*, of counsel), for appellant.

*A. J. Sawyer & Son*, for appellee.

GRANT, J. (*after stating the facts*).    In the briefs and oral arguments it was asserted by plaintiff's counsel—and denied by defendant's counsel—that there was not a pail of sand or a shovel provided on plaintiff's car with which he could throw sand upon the track in case of emergency.    Under this record the question is wholly immaterial.    No such ground of negligence is alleged in the declaration.    The duty of the defendant alleged in the declaration was to "equip and supply its said car with

142 MICH.—30.

sand boxes and sand." It is apparent that the case was tried solely upon this theory, so far as the use of sand is concerned. Neither the plaintiff nor any other witness testified that his car was not supplied with a pail of sand and a shovel. The other motormen testified that on their cars they had pails of sand. Plaintiff testified that his car was equipped substantially the same as others. The argument of the attorney for plaintiff before the jury, as printed in the record, is evidently based upon the failure to provide sand boxes and sand, which could be used automatically, and not a failure to provide a pail of sand to be used by hand.

The inquiry made by the plaintiff of the superintendent in the morning, before he commenced his day's work, whether the cars should not be equipped with sand boxes and sand, was not made with reference to the slippery condition of the track which developed at noon. It was made with a view to equipping the cars with this automatic arrangement for use on all occasions when necessary. There was evidence that the president of the street railway employés' union had requested Mr. Merrill, the manager of the road, to place sand boxes on the cars, and that Mr. Merrill said he did not think it was necessary; also that the superintendent of the road in Ann Arbor told plaintiff, on the morning in question, that he did not think it was necessary. There is evidence of but one other runaway, on account of the slippery condition of the track, on this road during the several years of its existence, and that happened several years before the plaintiff's accident. Evidence of this came from one Mullison, a motorman, who had been in the employ of the company for six years as motorman and conductor. Whether this runaway of Mullison's commenced upon Detroit street, or whether it commenced on the steep grade from Detroit street to the depot, the record fails to show. From the fact that the result was not very serious, it might be inferred that Mullison lost control of his car as it commenced to go down the steep grade by the depot. De-

fendant asserts in its brief that this was so, and that there never had been an accident of any kind on Detroit street. But, as already stated, the record does not show what the fact is, and the onus probandi is upon the plaintiff.  If other runaways had occurred going down this hill, under like circumstances and for the same cause, it would not only be competent, but very important, evidence; for this would have been notice to the defendant that it should have made all reasonable efforts to avoid a danger imperiling the lives and limbs of its employés and passengers.

Counsel for plaintiff, however, insist that they were prevented by the ruling of the court from showing other similar occurrences.  Counsel's basis for this claim is found in the exclusion of the following question, propounded to the depot master, one of plaintiff's witnesses:

"How many cars do you know of having run away and run down that hill before this, since you have been there — getting away and running down that hill, and running into that depot or something there?"

This was objected to as incompetent, and the objection sustained.  No attempt was made to show, by Mr. Mullison or any other employé of the road, similar runaways. Mr. Mullison's testimony was admitted without objection. Its competency is too clear to admit of doubt, if that runaway occurred on Detroit street.  There was no attempt to show that the depot master knew anything about the cause or circumstance of any other runaways, if there were any, nor whether they occurred in running down the very steep grade from Detroit street to the depot, or whether they started above on the street.  This question furnishes no basis for an argument that plaintiff was prevented from showing other similar runaways for similar causes upon the same portion of the road.

Having disposed of these preliminary questions, we now come to the first main question, viz.:  Was there evidence that the defendant was negligent in failing to provide its cars with sand boxes and sand, for use so that they could

be used automatically when occasion required ?  There is
no evidence that, during the several years in which de-
fendant had operated its road in the city of Ann Arbor,
any such runaway had occurred down Detroit street, or
that there had been any difficulty in controlling the cars
thereon.  So far, therefore, as this record shows, there had
been no difficulty in controlling the cars with the appli-
ances which the defendant had furnished.  It was cus-
tomary, evidently, for them to use sand, when deemed
necessary, with a shovel.  This was more inconvenient,
and undoubtedly involved more labor; but the record fails
to show that its use in this manner was insufficient to
avoid accident.  Whether the president of the union re-
quested the manager to equip the cars with sand boxes to
work automatically, because they were more convenient
and labor-saving, or whether because it was safer, does
not appear.  Defendant's cars were small and light.
There is no evidence that similar cars on other roads were
equipped with sand boxes, except that in the city of De-
troit two small cars were thus equipped.  These were the
only two in use in that city; the others being the large
cars.  Defendant's counsel assert that the ordinance of
the city of Detroit requires all its cars to be supplied with
sand boxes and sand.  We find no evidence of the ordi-
nance upon the record.  This witness (the president of
the union) was then asked:

  "State whether or not, at the time of this accident, good
railroading demands that these cars should have sand
boxes and sand supplied upon the cars ?
  "*A.* I believe they would have been safer.
  "*Q.* Would it have been good railroading to have done
it ?
  "*A.* I believe it would have been good railroading to
have done it; yes."

  On cross-examination he gave his definition of the mean-
ing of good railroading as follows:

  "What I mean by good railroading is that everything
should be done possible in equipping a car to insure safety."

This is not the rule, and renders this witness' opinion valueless, and his testimony should have been stricken out. Ordinary care is the rule applicable to this case. 4 Thompson on Negligence, §§ 3768, 3769; *Lamotte* v. *Boyce*, 105 Mich. 545. The means furnished must be those which, "measured by the standard of good railroading as actually conducted, can be said to be reasonably safe." *Balhoff* v. *Railroad Co.*, 106 Mich. 606; see, also, *Grand Rapids, etc., R. Co.* v. *Huntley*, 38 Mich. 537. It does not appear by this record that experience had shown that sand boxes were essential for safety in running defendant's cars. Neither is it shown that it is the custom of other roads similarly situated and running similar cars. It follows that there was no negligence shown in the failure to supply its cars with these appliances. A new trial, if one be had, may show a different state of facts. We now determine the question only upon the record before us.

2. I think it was error for the circuit judge to say to the jury that—

"He [plaintiff] was only a motorman without other training or experience or knowledge than what was merely sufficient to start and run and to stop the car, and he possessed no mechanical or other scientific knowledge or training, but was an inexperienced young man recently from the country."

I find nothing upon this record to indicate that plaintiff was not instructed in the usual manner and for the usual time considered necessary to enable motormen to run one of these cars alone. It is not a difficult thing to do. It was not necessary, neither was it expected, that he should understand all the mechanism of the car. No scientific knowledge was required. When he had been instructed and had learned how to control such mechanism by the use of the lever and the brakes he had acquired all that is essential. If anything happened to disable his car, the rules required him to have the next car take it back to the barn for repairs. He is not, as is a railway engineer, re-

quired to understand the mechanism of the machine and be able to repair it. That duty was very wisely left to others, educated for that purpose. The plaintiff had been employed as motorman of defendant's road for six months prior to the accident. No complaint is made that competent men did not instruct him, or that they did not instruct him for a sufficient length of time. He understood all the moves necessary to be made in order to start and control the car around curves, descending inclines, and at all other danger points. All of his instructors considered him competent. After a week's instruction he acted as motorman on defendant's cars in Ann Arbor until the 1st of November following. He was then placed under instruction for two weeks upon the main line between Ann Arbor and Detriot, engaged in running heavy cars, after which he returned to run the small and light cars in the city of Ann Arbor. His instruction was both by example and precept. He was familiar with sand boxes and sand. He used them on the main line; had run the cars for nearly six months without them in the city of Ann Arbor. He knew for what purpose the sand was used; he knew its effect as well as any one; he knew the danger of its absence as well as any one; and if he had it upon the car, and failed to use it when he saw the slippery condition of the track, he should be held to have assumed the risk. But for some assurance by the superintendent that the use of sand was unnecessary, plaintiff would clearly have assumed the risk. The assurance upon which he says he relies he states as follows:

"I asked him the question whether he did not think there would be, or ought to be, sand and sand boxes upon those cars, and he said, 'No;' that it was not the car, it was the man, who was to blame. He said he could take a car down there at any time, and go down there safely, and so could any other man who would go down there carefully."

Every motorman, so far as appears from this record, had taken his car down Detroit street in safety. If this

were so, the superintendent was justified in his statement. But the assurance was not that the use of sand in any manner was not necessary. It was only that sand boxes, constructed so as to feed sand automatically, were not necessary.

Judgment must be reversed, and new trial ordered.

CARPENTER, J., concurred with GRANT, J.

MOORE, C. J.   I agree with Justice GRANT that the case should be reversed, but think there was evidence tending to show the defendant was negligent in not equipping its cars with automatic sand boxes.

MONTGOMERY and HOOKER, JJ., concurred with MOORE, C. J.