# OCTOBER TERM, 1919.

SIMMONS v. PETERSEN.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—PERSONAL INJURIES—QUESTION FOR JURY.

In an action for personal injuries caused by a collision between defendant's automobile and plaintiff's buggy, where there were controverted questions of fact, the questions of defendant's negligence and plaintiff's contributory negligence were properly for the jury.

2. APPEAL AND ERROR—EVIDENCE—WEIGHT OF EVIDENCE.

This court will only reverse a case upon the question of the weight of the evidence when the verdict is against the overwhelming weight of the evidence.

3. EVIDENCE—EXCLAMATIONS OF PAIN AND SUFFERING—HEARSAY.

In an action for personal injuries, testimony by plaintiff's daughter as to exclamations of pain and suffering by plaintiff in her presence, held, admissible.

PER STONE, MOORE, STEERE, and BROOKE, JJ.

4. TRIAL—INSTRUCTIONS—NEGLIGENCE—DEGREE OF CARE REQUIRED.

In an action for personal injuries, caused by defendant's automobile colliding with plaintiff's buggy at a street intersection, an instruction by the trial court that the jury were to determine whether, under all of the circumstances, the driver of the automobile did "everything possible after he had discovered the danger to prevent an accident," held, erroneous, as it held him to a higher degree of care than the law demands, and may have misled the jury.

5. WITNESSES—CREDIBILITY—DRIVING AWAY FROM PLACE OF ACCIDENT—TRIAL—INSTRUCTIONS.

In an action for personal injuries caused by defendant's automobile, driven by his son, colliding with plaintiff's buggy, where it appeared that the conduct of the son at the time of the collision, and immediately thereafter, was not in violation of 1 Comp. Laws 1915, § 4816, it was error for the court to instruct the jury that his driving away from the place of the accident might be considered as bearing on his credibility as a witness, he having testified to very material matters. Per STONE, MOORE, STEERE, and BROOKE, JJ.

Error to Montcalm; Snow, J., presiding. Submitted June 4, 1919. (Docket No. 39.) Decided November 5, 1919.

Case by Sanford Simmons against Frank Petersen for personal injuries.   Judgment for plaintiff.   Defendant brings error.   Reversed.

*Rarden & Rarden* (*S. H. Person* and *Dean W. Kelley,* of counsel), for appellant.

*Nichols & Nichols* (*A. R. Locke,* of counsel), for appellee.

STONE, J.   This case was brought here by the defendant to review a judgment for the plaintiff obtained in the circuit court for the county of Montcalm.   This suit was begun on October 6, 1917.   The declaration alleged that on September 6, 1917, the defendant was the owner of a Dodge touring automobile, which, at the time of the injury complained of, was being driven and operated by one Ralph Petersen, a son of defendant, who was at the time driving the same with the express knowledge and consent of the defendant; that on the evening of said day, while in the exercise of due care and caution, the plaintiff was lawfully proceeding with a team of horses and buggy up Williams street, a public street in the city of Greenville, and had reached a point directly past the center of Lafayette street, a public street in said city, which the said Williams street intersected at right angles; that the plaintiff was, at the time of the injury complained of, turning his horses at said intersection of said streets, for the purpose of proceeding northward on Lafayette street; that the plaintiff was, at the time of the injury, at the extreme right of Williams street and his buggy was located directly south of the center of said Lafayette street at the intersection of said streets, and the horses on said buggy were facing, or had started to face in a northerly direction upon Lafayette street, upon the intersection, when the said automobile of said defendant was so carelessly managed and driven that it ran upon and crashed into said buggy of the plaintiff, throwing him to the

ground, and causing him great injury, pain, and suffering, and greatly damaging said buggy; that there was at the time of said injury six to eight feet or upwards between the rear of said buggy and the westerly curb of Lafayette street, and sufficient room between the said curb and buggy for said automobile to have been driven safely between said rear end of said buggy and the said westerly curb of Lafayette street, had any degree of care been used in the operation of the same.

It is alleged that the negligence complained of consisted in said automobile striking the plaintiff's buggy; in running said automobile at an excessive and unlawful rate of speed, and in failing to sound a warning as said Ralph Petersen was approaching said intersection; and failing to go through the space between the rear end of plaintiff's buggy and the westerly curb of Lafayette street; in failing to slow down and come to a stop before striking said plaintiff's buggy; and in failing to take heed or notice that plaintiff's buggy was in the process of crossing, and making the turn to proceed in a northerly direction up Lafayette street. The plaintiff's bodily injuries consisted of a broken right hip, and shock to his nervous system by being thrown to the pavement, mental and physical suffering, and claimed permanent injury to said limb. A map of the place where the collision occurred, and of the vicinity, found on page 14 of the record, is appended here for convenience of reference. Some points testified to, and not in dispute, are as follows:

The pavement on Williams street only extends a short distance west of Lafayette street; Lafayette street is 40 feet wide from curb to curb; at Williams street the pavement begins to narrow, and north of there it is 36 feet wide. The house of Dr. Savage is 40 feet from the north curb of Williams street. A person on the curb on Williams street, directly south

of the southeast corner of the Dr. Savage house, can see up Lafayette street to the railroad track. Charles street is 26 rods and 4 feet north of the north curb of Williams street.

Upon the night of the injury, an exhibition of fireworks had taken place at the fair grounds in the western part of the city, and a large crowd had gathered there with teams and automobiles. The plaintiff attended the fireworks with his wife and daughter and another woman. After the fireworks, and about 10 o'clock p. m., they started to go to their home north of the city in a two-seated buggy drawn by a span of old horses. He turned onto Franklin street and drove north across the river to Williams street, where Franklin street ends; and then east on Williams street to Lafayette street, and while attempting to turn north into said street, his buggy and defendant's automobile came in collision. On the same night the defendant's son, Ralph, 18 years old, accompanied by Mary Frantzen, of the same age, was also at the fireworks. Ralph was driving the defendant's automobile, with his permission, and had started to go to his home north of the city, going out Lafayette street. When these young people had got out of the city, they "discovered that they were hungry, and turned around and started back down town to get something to eat." After turning around there is no dispute that Ralph was driving south on the west side of Lafayette street. The automobile and plaintiff's buggy came in collision at the intersection of Lafayette and Williams streets, the left fender of the car coming in contact with the left hind wheel and the left step of the buggy, and the step was bent inward and backward, and one spoke of the buggy wheel was broken, and the print or impression of the outer face of the buggy tire was made on the front end of the left fender of the car. There were some other slight marks on the end of the fender, and a slight bruise on the grease cup on the end

of the left front spring of the car. There was evidence that at the collision the horses sprang forward, breaking the evener and thus becoming detached from the buggy, ran up Lafayette street, dragging the plaintiff out over the dashboard by the lines to which he was holding, and breaking down the dashboard. He fell upon the pavement and was bruised and shocked by the fall, and the femur bone of his right leg was obliquely fractured. He was confined to his bed for about three months and suffered much pain from the injury. He testified that after he got out of bed he was not able to do hard manual labor and that he had done nothing but chores around up to the time of the trial, which took place in March, 1918, and that by reason of the injury he had been compelled to expend in doctor's bills, help on his farm, etc., the sum of about $350.

When the collision occurred Ralph got out of the car and went in front of it and examined it. He testified that he was excited and frightened, and soon a lot of people gathered there; that he saw the plaintiff go out of the buggy, but saw nothing of him after that; that he got back into his car, and turned west on Williams street, north to Charles street, then east to Lafayette street, and then home. The next morning he told his father of the accident, and the latter went to Greenville and saw the plaintiff. Lafayette street was, at the time in question, well lighted with arc lights, one of which was directly over the center of the intersection of said streets.

The questions in controversy at the trial related to the manner in which the automobile was driven, its speed, and what, if anything, the driver did to avoid the collision; the conduct of the plaintiff, and what care, if any, he exercised in going upon Lafayette street at the time; and the condition of the street as to traffic, when he went upon it. There is upon these vital questions an irreconcilable conflict in the testi-

mony. F. R. Hicklin, a witness for the plaintiff, testified that he was walking south on the west side of Lafayette street at the time, and north of Williams street. He testified:

"Later I noticed a rig, looked to me like a two-seated carriage with a team of horses hitched to it. I thought there were three people in it at the time. I found out afterwards that there were four. The team was on a light jog, I should say. They were going east on Williams street. The automobile was coming from the north going south. I noticed the automobile as it was approaching the corner. At the time the rig reached a point parallel with the curb on the west side of Lafayette street, the automobile was about 25 or 30 feet away, I would think. I mean 25 or 30 feet to the north. It was on a line with me. I figured I was about that far from the crossing.

"Q. How far had the team proceeded out into Lafayette street when the automobile hit it?

"A. They were about 10 feet from the curb. The automobile hit them right amidship, right between the two wheels.

"Q. Would you say the team had reached a point parallel with the center of the intersection of Lafayette and Williams streets at the time it was struck?

"A. Yes, sir.

"Q. Had it reached a point the other side of that towards the east?

"A. No, I wouldn't think so. They were just about in the middle of the street, I judge. The driver had started to turn his horses towards the north, at the time of the accident. The collision made a loud crash. The driver of the rig was thrown from the rig on the pavement, I should judge about 12 feet in a sort of northeast direction."

On cross-examination he was asked and answered as follows:

"Q. Just before dinner you testified that when you —just after seeing the team, you looked towards the automobile, and it was 10 or 12 feet from the buggy. Now I want to know in what shape the buggy was at that time?

"A. The buggy was about 8 feet I should judge

from the curb, the curb on the west side of Lafayette street. The buggy was going in a semicircle going northeast, he was making the regular turn you would naturally do with a team of horses.

"*Q.* Turning at that point on the west side of Williams (Lafayette) street?

"*A.* Yes, sir.

"*Q.* To go north?

"*A.* Yes, sir. * * * I should judge it was about 25 or 30 feet south of the north curb of Williams street that these vehicles came together. I should say the Petersen car stopped pretty near in the middle of Williams street, the hind end of it was past the curb on Williams street."

This witness also testified that when the car reached the intersection line of Williams street and Lafayette street, it was going about 18 miles an hour, between that and 20, and was going 18 miles an hour when the collision occurred. And that the driver of the car was driving with one hand, and had one arm around the girl.

Asked on cross-examination:

"*Q.* Do you state as a matter of fact he did have his arm around the girl?

"*A.* I would say yes; that he had his arm around the girl, yes.

"*Q.* That he was driving the car with one hand?

"*A.* I think so, yes."

Mabel Simmons, the daughter of the plaintiff, testified that she was riding on the front seat with her father at the time of the collision. Asked how he was driving, she said:

"Well, just as we got to the corner he took out the whip, and tried to drive them faster around the corner. * * * They were old horses.

"*Q.* When you drove on Lafayette street did you see any cars?

"*A.* Yes, sir. I saw one coming from the north just before we drove on. I looked to the south and saw one coming from the south.

"*Q.* How far was the one coming from the north from you when you drove on Lafayette street?

"*A.* About two-thirds of a block, I should think it was—going south.

"*Q.* I wish you would tell me how far you drove on Lafayette street before the accident occurred?

"*A.* Well, we got about the center, I should think, of the street, when we were hit, back of the buggy."

Asked to tell just what occurred, she said:

"Well, when we came to Lafayette street I looked up one way and saw Mr. Petersen's car first coming, then they were two-thirds of a block down north; I looked the other way, and saw the other car coming just off from the bridge. I thought we would have just time to make it before he came up that way; then we started out to the corner to turn a square corner, and just as we got started to turn, horses started to turn, Petersen he came up there quite close. I looked to see how far he was coming; I saw he was going to hit; I thought he would not then, we would have plenty of time to turn and go in the other direction, and go down Lafayette street; the first thing I knew he hit us, and I went over the front of the buggy, and went down, kind of my head under the car."

After testifying that plaintiff was eight weeks in bed with a weight on his leg, she was asked if she was able to discover whether plaintiff suffered pain or not. She said she was from the way he screamed and took on about it. This, being objected to, was at first stricken out. Later in her examination the following occurred:

"*The Court: Q.* What was it you said your father said to indicate to you he was in pain?

"*A.* Screamed, exclamations, pained him awful.

"*The Court:* Screamed, you said?

"*A.* Yes, sir.

"*The Court:* I think I will allow it to come in.

"*Mr. Rarden:* When was that?

"*The Court:* After the accident, I understand.

"*Q.* During the time he was in bed?

"*A.* Yes, sir.

"*The Court:* Was the physician there?

"*A.* He did it all the time, whether the physician was there or not.

*"Mr. Rarden:* Move to strike it out.

*"The Court:* I think the rule is, statements of parties as to pain and suffering would be hearsay, but present exclamations of pain—

*"Mr. Rarden:* Take an exception."

On cross-examination this witness testified that the defendant's automobile was about two-thirds of the way up the block, when plaintiff commenced to go on the street. She said:

"I first saw the automobile just about as the horses' heads started to come on the road, a couple of feet or so before the horses started to go on the road, I looked. I don't know whether Dr. Savage's house is about 35 feet back from the street. After you get by Dr. Savage's house you can see up Lafayette street, clear up to Kipp's store, and beyond. * * *

"Q. So that he whipped up his horses and tried to beat the automobile out, but it was going so fast it caught him?

"A. Yes, sir, it must have."

Mrs. Rose Simmons, plaintiff's wife, was a witness. She testified that he was 65 years old on May 20, 1917; his business that of a farmer; that Williams street west of Lafayette street is a well lighted street. Asked where the rig was when she first saw the automobile coming from the north, she answered:

"Just turning a square corner.

"Q. How far away when you first noticed it, when you were turning the square corner?

"A. About half a block away. * * * I saw the automobile, but I didn't think that the auto would hit us, I didn't judge it would. I couldn't tell how far we were south of the north curb of Williams street, when the automobile came in contact with the buggy, but we were just turning north, the horses were just turning. We came down on the south side of Williams street. We were on the south side of the road; we have to make a good big turn with that old buggy, it is almost a lumber wagon." * * *

On cross-examination she testified:

"We drove from Williams street on Lafayette street

and drove from the south side of the street, just the same as anyone would, and turned a square corner on the east side of Lafayette street.

"*Q.* Do you know whether you had got by the center before you started to turn north?

"*A.* I think so, because the horses' heads were that way, they sure must have been.

"*Q.* Do you know?

"*A.* Yes, sir. I think the horses were east of the center of the street. The buggy was in the center of the street."

The plaintiff testified that when he got to the intersection of the streets he looked to the south and saw an automobile coming over the bridge, and from the north he saw a car coming about 4 rods south of the other side of the block.

"*Q.* What, if anything, did you do to get out of the way of the approaching car?

"*A.* I picked up my whip and hit the horses to hustle them, and get across the street, and get on to the right hand side of Lafayette street. I was finally hit by the car. I got to the center of the street, and was making the turn north, when I was hit by the car. * * * I should think my wagon was about 12 feet from the west curb of Lafayette street when it was struck."

On cross-examination:

"*Q.* Where were you with reference to the center of the street, where was your buggy standing at the time the automobile struck your buggy?

"*A.* My buggy, horses and front wheels were across the center of the street.

"*Q.* On the east side of the center?

"*A.* The east side.

"*Q.* Of the center of the street?

"*A.* Of the center of the street. The whole buggy was not across, the horses were. The hind wheels of the buggy were west of the center, just west; it was turning, the buggy was cramped then. * * *

"*The Court:* Why did you try to get ahead of this automobile, why didn't you stop?

"*A.* I didn't want to stop there on the street and

let the automobile run right into me, did I, when I saw it coming?

"*Q.* I understand you whipped up your horses just as you were entering into Lafayette street?

"*A.* I whipped up my horses just as I was entering Lafayette street, so as to make that turn ahead, get ahead of the automobile coming from the south. I wanted to be on the east side of that automobile, and miss the automobile coming from the north."

Question by plaintiff's counsel:

"At the time you were struck by the automobile, how far was the rear end of your wagon from the west curb of Lafayette street?

"*A.* I should think it was 10 or 12 feet.    *    *    *

"*The Court:* Understand me, when you saw the car coming from the north, you had already whipped up your horses to avoid the car coming from the south, is that correct?

"*A.* Yes, sir.

"*Q.* Where were your horses when you first saw this car from the north?

"*A.* Just coming out on the street, was just coming out.

"*Q.* Were they going faster than they had before?

"*A.* Yes, sir, I just touched them up.

"*Q.* Then you saw the car coming from the north?

"*A.* Then I saw the car coming from the north. Went right on making the turn, to get ahead of the one coming from the south."

By defendant's counsel:

"*Q.* You hadn't got out on Lafayette street at the time you saw this car coming from the north; why didn't you stop your buggy and let the car go by?

"*A.* I thought I had time to get across the street on my own side of the road, before it got there."

At the close of the plaintiff's evidence, defendant's counsel moved for a directed verdict in his favor, for the reasons that the plaintiff was negligent in whipping his team and trying to get across ahead of the automobile he saw coming; also in not stopping and keeping out of danger when he saw the automobile

six rods away; and in driving rapidly down to, and upon this street, knowing it was congested with traffic. The court reserved its opinion until defendant put in his testimony.

On behalf of defendant, Sephas Hansen testified that he was present, and that he should judge that the automobile was going between 8 and 10 miles per hour, and the team just about as fast.

"The buggy was headed east at the time it was struck, and the horses northeast. The horses were on the east side of the center of the street, and a little bit to the north. The buggy when it came out there did not go around the center of the street intersection, before it was struck."

Earl Despelder, a witness for defendant, testified that he was present at the collision, and being asked how far the rig was from the west curb of Lafayette street when hit, he answered:

"I should judge about 3 or 4 feet.

"Q. Where were the horses at that time?

"A. They were further near the center of the street. They were turning northeast. They were north past the center post. They were just coming out of Williams street and past the corner inside of the post and curb corner, going northeast, just making that swing. (Consulting map.) They were just swinging right in here, inside of the stake. Northwest of the stake. When the automobile struck the buggy, it was pushed to the south about 5 or 6 feet."

On cross-examination witness repeated that the plaintiff turned inside of the post.

Ralph Petersen, son of defendant and the driver of the car, testified that when traveling south on Lafayette street he was close to the west curb, going about 10 miles an hour, that there was much traffic going north and the lights were bright and bothered him some, that he kept a sharp lookout and that he was right on the buggy, within 6 feet of it, before he saw it, going north "at an angle towards the northeast."

He described how he tried to stop the car. He denied that he had his arm around the girl and said he had both hands on the steering wheel. That he could stop the car, running at the rate of 10 miles an hour in about 8 feet. And that the reason why he did not turn to the west behind the buggy was that there wasn't room. Miss Frantzen, the young woman who accompanied Ralph, corroborated his testimony in every respect. At the close of the testimony, the motion to direct a verdict for the defendant was renewed, but the court reserved its decision, and directed that the case be submitted to the jury.

The court, among other things, charged the jury as follows:

(12) "It has been suggested and claimed on the part of the plaintiff that he (Ralph Petersen) should have turned to the right and gone west on Williams street. This is a question of fact for you to determine under all of the circumstances, gentlemen of the jury, having in mind the situation as it appeared to him at the time, take into consideration the traffic upon the road, and all other things being considered, as to whether or not the defendant did do, or the defendant's son did do, everything *possible*, after he had discovered the danger, to prevent an accident."

Also as follows:

(14) "You have heard the testimony in this case, as to what defendant's son did after the accident; that he got out of his automobile and looked at the front of it, and later got in the car and drove away, drove west on Williams street, then north to Charles street, and over to Lafayette street. That was admitted simply to prove the transaction that existed there. There is no negligence attributable to the defendant in this case, because he didn't stay there, or because he didn't render aid. You may take that into consideration, however, as bearing upon the testimony of the defendant in this case, and if it has any weight with you at all, you may make application of it and consider it in determining what weight you will give his testimony in the case; in other words, you may

consider it, if you think it worthy of consideration, as affecting the credibility of the witness in the case, but the act itself is not relied upon or claimed in the case to be an act of negligence; the mere fact he ran away is not an act of negligence of itself."

The jury returned a verdict for the plaintiff in the sum of $1,500 damages. Later a motion for a judgment for the defendant, notwithstanding the verdict, was duly entered and submitted upon the ground of contributory negligence for the reasons stated in the motions for a directed verdict, the reasons being elaborated. The learned circuit judge denied this application, and upon the question reserved held that there was a question of fact for the jury as to the contributory negligence of the plaintiff, and that the court was unable to say from all the evidence in the case that the plaintiff was guilty of such contributory negligence as would preclude recovery, and judgment upon the verdict was entered accordingly. Thereupon a motion for a new trial was duly entered and submitted, the main grounds of the motion being that by the overwhelming weight of the evidence the defendant, or the driver of his car, was not guilty of negligence; that by such weight of evidence the plaintiff was guilty of contributory negligence; and that the verdict was against the weight of all the evidence in the case. This motion was denied and exceptions duly entered.

In this court defendant's assignments of error raise the questions above indicated, and others, some of which will not be specifically referred to, but all of which have been considered. Both upon the oral argument and in their briefs counsel for appellant were so persistent in their claim that, as matter of law, the plaintiff was guilty of contributory negligence; that the defendant was not guilty of any negligence; and that the verdict was against the weight of all the evidence, that we have examined the record with great

care. While we have set forth so much of the evidence as leads to tediousness, yet in fact we have inserted only a small part thereof. Enough appears, we think, to show that controverted questions of fact are involved. Upon the oral argument we were of the impression that the case was a proper one for the consideration of a jury, upon the main features involved. That impression has been strengthened by an examination of the record. If some of the defendant's witnesses were to be believed, the plaintiff was guilty of contributory negligence; but the questions were such, in view of the plaintiff's evidence, that it was proper to submit them to the jury.

We are unable to say that the plaintiff should be held to be guilty of contributory negligence, as matter of law. As we said in *Beach* v. *City of St. Joseph,* 192 Mich., at p. 301:

"Before such a conclusion can be arrived at, all reasonable minds must reach the same decision, that under the undisputed testimony, there was such contributory negligence as would bar recovery." See cases cited.

Whether the plaintiff "cut the corner," or whether he observed the ordinance and law, depends upon the facts, which were in dispute. Upon the subject of the weight of evidence we do not think that it can be justly said that the verdict was against the overwhelming weight of the evidence. What we said in *Druck* v. *Antrim Lime Co.,* 177 Mich. 364, is applicable here:

"The rule is well settled that this court will only reverse a case upon the question of the weight of the evidence when the verdict is against the overwhelming weight of the evidence. The verdict must be clearly against the great weight of the evidence to require this court to overrule the decision of the circuit judge in refusing a new trial."

See *Walsh* v. *Railway Co.,* 185 Mich. 177, 184.

Did the court err in receiving the testimony of Mabel Simmons as to exclamations of pain by the plaintiff? It is to be noted that this case was commenced one month after the injury. Whether pending or not at the time of the exclamations does not appear. After an examination of the following cases, we conclude that the court did not err in its ruling. *Hyatt* v. *Adams*, 16 Mich. 200; *Johnson* v. *McKee*, 27 Mich. 473; *Grand Rapids, etc., R. Co.* v. *Huntley*, 38 Mich. 543 (31 Am. Rep. 321); *Strudgeon* v. *Village of Sand Beach*, 107 Mich. 496; *Will* v. *Village of Mendon*, 108 Mich. 251; *Marshall* v. *Railroad Co.*, 171 Mich. 180; *Loose* v. *Township of Deerfield*, 187 Mich. 206.

In *Marshall* v. *Railroad Co.*, *supra*, stress was laid upon the point that it was one of the principal contentions of the defendant that plaintiff suffered no such injury as he alleged. Here there is no such claim. The evidence received only tended to enhance the damages, and there is no claim here that the verdict was excessive.

We are constrained to hold, however, that the court erred in that part of the charge covered by the 12th assignment of error, as to whether the son of defendant did "everything *possible* after he had discovered the danger to prevent an accident."

As this court said in *Pearl* v. *Railway*, 188 Mich. 84, 88, in dealing with a similar question:

"We think it held him to a higher degree of care than the law demands, and may have misled the jury."

The part of the charge referred to practically said to the jury that under the law the driver of the car was required to do everything *possible* to avoid the accident. He was only required to use such care, and take such course as an ordinarily prudent person would under like circumstances. There should also be taken into consideration the conditions as they appeared to the driver of the car in the emergency of the moment.

We are also of the opinion that there was prejudicial error in that part of the charge set forth in the 14th assignment of error. It appearing by the undisputed evidence that the conduct of Ralph Petersen, the driver of the automobile, at the time of the collision, and immediately thereafter, was not in violation of the provisions of section 4816, 1 Comp. Laws 1915, it is difficult to understand from this record how the fact of his driving away, after the collision, should affect the weight of his testimony, or his credibility as a witness.

He had testified to matters very material in the case—upon questions vital to the issue. The jury were told that bearing on his credibility as a witness, they might consider that he drove away from the place of the accident. In our opinion this was prejudicial error. We are impressed with the view that the case was a close one, and that possibly these two errors in the charge may have led to a miscarriage of justice in the verdict.

For the errors pointed out the judgment is reversed and a new trial granted, with costs to appellant. We find no other error in the record.

MOORE, STEERE, and BROOKE, JJ., concurred with STONE, J.

FELLOWS, J. I concur in reversal on the first ground stated in the opinion.

BIRD, C. J., and KUHN, J., concurred with FELLOWS, J.

The late Justice OSTRANDER took no part in this decision.