TEXAS & N. O. R. CO. v. STEPHENS. (No. 258.)

(Court of Civil Appeals of Texas. Oct. 27, 1917.)

1. EVIDENCE ⚖=271(11), 317(3)—SELF-SERVING DECLARATIONS—HEARSAY—STATEMENTS AS TO BODILY CONDITION.
Where a physician examined an injured person long after her injuries were sustained, and after the filing of suit, for the purpose of qualifying as an expert, his testimony as to her statements to him concerning her health before and after the injury, the regularity of her functions, and her pain and suffering, was inadmissible as hearsay and self-serving.

2. EVIDENCE ⚖=548 — EXPERTS — TESTIMONY BASED ON STATEMENTS OF INJURED PERSON.
The testimony of a physician who examined an injured person long after the injuries were sustained for the purpose of qualifying as an expert was inadmissible, where his opinions were based in part, at least, on her statements relative to the cause of the injury, and the manner in which she was affected by the injury.

3. APPEAL AND ERROR ⚖=1050(1)—HARMLESS ERROR—ADMISSION OF EVIDENCE.
In an action for personal injuries, where there was conflicting evidence evenly balanced, the admission of a physician's testimony as

---

⚖=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

to the hearsay and self-serving declarations of the injured person and his opinions based in part thereon was prejudicial, even though defendant introduced similar evidence.

Appeal from District Court, Liberty County; J. Llewellyn, Judge.

Action by C. Stephens against the Texas & New Orleans Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Orgain, Butler & Bolinger, of Beaumont, and Baker, Botts, Parker & Garwood, of Houston, for appellant. H. E. Marshall, D. J. Harrison, and W. T. Norman, all of Liberty, and John M. Conley, of Beaumont, for appellee.

BROOKE, J. This suit was begun by the filing of plaintiff's original petition in the district court of Liberty county, Tex., Ninth judicial district, on May 10, 1916. Liberty county being also in the Seventy-Fifth judicial district, the cause was transferred from the Ninth to the Seventy-Fifth district court; and tried in the latter court, beginning on December 1, 1916.

Plaintiff brought this suit against the Texas & New Orleans Railroad Company for injuries to his wife, alleging that he and she were residents of Harris county, Tex., and that on May 4, 1916, plaintiff's wife boarded a certain passenger train operated by the defendant company, at Houston, and became a passenger thereon for Liberty, Tex. On November 29, 1916, plaintiff filed a second amended original petition, on which trial was had. Plaintiff alleged that the train on which his wife, Marcenia Stephens, took passage for Liberty, Tex., arrived at Liberty about 8:30 a. m. on May 4, 1916; that shortly before said train arrived at Liberty, one of defendant's agents in charge of said train came through the car in which plaintiff's wife was riding, and announced that Liberty was the next stop; that when such announcement was made, plaintiff's wife, as the train came to a stop at the depot at Liberty, picked up her various bundles and arose to her feet in the aisle in the car in which she was riding, and started toward the door of the car, for the purpose of leaving the train; that, thereupon, without warning to plaintiff's wife, and without any knowledge of plaintiff's wife, said train was caused to give a certain lurch or jerk, which caused plaintiff's wife to be thrown from her feet in the aisle of the car against one of the seats, and from the seat to the floor, with great violence, and also caused plaintiff's wife to fall upon a bundle which she was carrying in her hands while attempting to leave the train; that thereby plaintiff's wife's stomach, abdomen, and side were bruised, and the muscles of her back, thighs, hips, shoulders, and arms were strained and bruised; that she was also frightened, and caused to suffer great physical pain; that she was removed from the train and taken to her daughter's house,

a short distance from Liberty, where she was confined to her bed and under the treatment of a doctor for about 12 days, and that during said time she suffered great physical pain and mental anguish, and that since said time she continuously suffers great physical pain. Plaintiff further alleged that by said fall and injury his wife was caused to have a miscarriage, she being pregnant at the time she received said injury and fall; that in connection with said miscarriage, plaintiff's wife suffered most intense and excruciating physical pain and mental anguish; that since such miscarriage she had continuously suffered with headaches, with soreness and pains from injuries to her stomach, abdomen, shoulders, neck, back, limbs, and pelvic organs, and an injury to the female organs, known as the "uteris," and also an injury to the female organs, which injury is known as granular condition of the "crevix." Plaintiff further alleged that his wife's injuries were permanent, and that her health had been permanently impaired on account thereof, and that she would continue to suffer physical pain in the future; that prior to said injuries his wife was a stout, healthy, and robust woman, but that since such accident she had become a permanent invalid, and was continuously under the treatment of a doctor; also that such injuries were caused directly and proximately by the carelessness and negligence of defendant's agents and servants in causing said train to give a certain jerk or lurch, without warning to plaintiff's wife, and without the knowledge of plaintiff's wife. Damages were alleged in the sum of $10,000.

Defendant answered on May 25, 1916, by general demurrer and general denial; and thereafter, on November 29, 1916, filed its first amended original answer. After a general denial and general demurrer, defendant answered that if plaintiff's wife was injured in any manner or to any extent while a passenger on the train in question, that such injuries were directly and proximately caused by negligence on the part of plaintiff's wife, in that she arose from her seat before the train came to a full stop at the station of Liberty, and attempted to walk down the aisle of the car in which she was riding, and to the door, while the train was still in motion, and thereby she failed to use proper care and caution for her own protection and safety, and such actions on her part were the direct and proximate cause of her injuries, and that, therefore, defendant was not liable. Defendant further answered that if plaintiff's wife was injured in any manner, or to any extent, while a passenger on defendant's train at the time and place stated, which was denied, that any such injury she received at such time and place was trivial, and of no consequence, and that no serious result would have followed such injuries if she had not imprudently, carelessly, and negligently failed to properly care for herself after reaching Liberty on the occasion in question; that when plain-

tiff's wife reached Liberty and arrived at her daughter's home she imprudently carried several of her grandchildren in her arms, thereby fatiguing herself physically, and exciting herself mentally; that if it was true that plaintiff's wife was with child at that time, and that thereafter she suffered a miscarriage, that such result was brought about and caused by her carelessness and negligence in carrying and nursing her grandchildren, and working herself up into a state of excitement, and that in so doing she failed to use due and proper care, and was guilty of contributory negligence, which directly and proximately caused such miscarriage, and that defendant was not liable therefor.

The case was tried before the court with the assistance of a jury, and was submitted to the jury on certain special issues. In connection with the special issues submitted, the court charged the jury as to the liability of the railroad company toward their passengers, to the effect that it was the duty of a railroad company to exercise toward its passengers that high degree of care to avoid accidents or injury which a very careful and prudent person would use under similar or like circumstances, and that the failure to do so was negligence, but that railroad companies are not insurers of the safety of their passengers. The court further charged the jury on contributory negligence, defining same as such an act or omission on the part of the person injured, amounting to the want of ordinary care and prudence, which concurring or co-operating with some negligent act of the defendant, becomes a proximate cause of the injury complained of, but for which negligence the injury would not have occurred.

The court also properly charged the jury on the burden of proof, both as to primary and contributory negligence, and defined preponderance of the evidence. At the request of the defendant, the court also defined proximate cause in connection with the special charges submitted, and at the request of the defendant instructed the jury that if the jury believed that the miscarriage complained of, if any, was produced or brought about by the conduct of plaintiff's wife in handling or nursing her grandchildren, together with such injury as she may have sustained on the train, and that if her conduct in handling such grandchildren was contributory negligence, as defined in the court's charge, that the jury should not allow plaintiff anything as damages for any injuries that resulted to his wife in consequence of such miscarriage.

The first special issue submitted by the court to the jury was whether or not the train was caused to give a certain jerk or lurch, as alleged in plaintiff's petition. To this the jury answered in the affirmative. The second special issue submitted by the court to the jury was whether or not defendant's agents were guilty of negligence in caus-ing the train to give such sudden jerk or lurch. This the jury answered in the affirmative. The jury assessed the amount of damages in the sum of $5,000, on which verdict judgment was duly entered in favor of plaintiff, and against defendant in the sum of $5,000. On December 2, 1916, defendant filed its original motion for new trial, and on December 14, 1916, its first amended motion for new trial, said motion on the same day being overruled by the court, defendant excepting and giving notice of appeal. On February 9, 1917, defendant filed its application for writ of error; also its writ of error and supersedeas bond.

The first assignment of error challenges the action of the court in permitting plaintiff to offer in evidence on the trial hereof the answer of plaintiff's witness, Dr. C. C. Nash, to interrogatory No. 9, propounded by plaintiff to said witness, as contained in the deposition of said witness, said answer reading as follows:

"The said Mrs. Stephens did give me a history of her case; that she had been in perfect health for some 8 or 10 years, and had missed her monthly period before the accident something like 3 or 4 months, and since her injury her monthlies are regular, but suffers with more or less pain in her hips, back, and lower abdomen."

Plaintiff in error claims that the answer of said witness Nash was clearly inadmissible and incompetent, for the reason that same was hearsay as to said witness Nash, and was but the reproduction through him of a statement which was made to him by plaintiff's wife, as to the cause, character, manner, and extent of her claimed injuries, and besides, the same is a self-serving declaration on the part of said plaintiff's wife, and made long subsequent to the filing of this suit. Under this assignment, plaintiff in error makes the following propositions:

"(a) In a suit by plaintiff for damages by reason of personal injuries sustained by his wife, statements of plaintiff's wife in regard to pain which she suffers since the injury complained of, made to a physician who examined her for the sole purpose of testifying as an expert in behalf of plaintiff at the trial, are inadmissible, and the admission of such statements is error prejudicial to defendant, and was reasonably calculated to and probably did cause the rendition of an erroneous verdict herein.

"(b) In a suit by plaintiff for damages by reason of personal injuries sustained by his wife, statements made by plaintiff's wife to a physician or to any other person in regard to the condition of her health and the regularity of her functions before the accident alleged, and in regard to the regularity of her functions and the suffering of pain since the alleged accident, which statements are not the mere spontaneous expressions and exclamations of present pain and suffering, but are entirely narrative in character, are self-serving and hearsay statements, and cannot be testified to by the physician; and the admission of such statements, over the objection of defendant, is error, prejudicial to defendant, calculated to cause, and probably causing, the rendition of an erroneous verdict."

Defendant's bill of exceptions setting up this matter was as follows:

"The plaintiff introduced in evidence the deposition of Dr. Nash, witness for the plaintiff, and among other interrogatories propounded to said witness was interrogatory No. 9, reading as follows: 'If in answer to the foregoing questions you have said that you examined the said Mrs. C. Stephens once, or more than once, please state whether or not she gave you a history of her case, and if she did, you will please state that history that she gave you very fully'—to which interrogatory the defendant then and there objected, on the ground that same called for a statement from said witness as to what plaintiff's wife told said witness about her injuries, the extent thereof, and how the same were caused, and that to permit said witness to answer said interrogatory would be virtually to reproduce and state to the jury what plaintiff's wife told said witness regarding the nature of her injuries and the cause thereof, all of which would be hearsay on the part of said witness, based upon a statement made to him by plaintiff's wife, of a self-serving nature, and therefore inadmissible for any purpose, but the court overruled said objection to said interrogatory, and permitted said witness to answer same, as follows: 'The said Mrs. Stephens did give me a history of her case; that she had been in perfect health for some 8 or 10 years, and had missed her monthly period before the accident something like 3 or 4 months, and since her injury her monthlies are regular, but suffers with more or less pain in her hips, back, and lower abdomen'—to which answer the defendant then and there also objected, on the ground that same was hearsay testimony, and to admit the same would be virtually to permit the witness to reproduce and state to the jury what plaintiff's wife had told him about the condition of her health prior or to the time she claimed to have been injured, and the character and extent of the injuries claimed by her to have been received, and the manner and cause thereof, which objection also was by the court overruled, to which action of the court the defendant then and there excepted, and said answer of said witness was read to the jury, and the defendant here now tenders to this court this its bill of exceptions No. 2, and prays that the same be allowed and approved and ordered filed as a part of the record of this case.

"Hightower, Orgain & Butler,
"Attorneys for Defendant.

"O. K.
H. E. Marshall, Atty. for Pltff.

"The foregoing bill of exception was presented to and has been by me duly considered, and the same is found correct, and is approved and allowed and ordered filed as a part of the record in this case. This the 14th day of December, 1916. With this explanation: Plaintiff stated in answer to defendant's objection that he offered the testimony of Dr. Nash, as an expert, and that the witness Mrs. Stephens had already testified in open court to the same facts that Dr. Nash testified to in answer to direct interrogatory No. 9, and said Mrs. Stephens had testified to those facts as testified by Dr. Nash in answer to interrogatory No. 9; and the court, for that reason, admitted the testimony of Dr. Nash. But Mrs. Stephens did not testify that she had stated any of such facts to Dr. Nash.

"J. Llewellyn, Judge Presiding."

It will be, perhaps, well, in this connection, to give a short statement of the facts, as testified to by physicians for both plaintiff in error and defendant in error; also a short statement of the facts testified to by plaintiff herself. Mrs. Marcenia Stephens testified, substantially:

"I am the wife of C. Stephens. I live now on West Twenty-First street, Houston Heights, Houston, Tex. * * * I had occasion to take a train in Houston about May 4th of this year for Liberty. I came to see my daughter. * * * I got to Liberty about 8 or 9 o'clock, early in the morning. * * * Just before I got to Liberty some of the trainmen just called out Liberty. The words they said were, before they got to Liberty they said the next stop would be Liberty. The train came on up to Liberty, to the depot, and it stopped. I had with me a suit case, and had a paper box with some dishes in it and a gun. The gun was all wrapped up with paper and a cord around it. When the train stopped, at first I looked to see if anybody was going to help me off, and nobody came, and I made the attempt to get off myself—gathered up my bundles, suit case, and gun, and made the attempt to get off, and the train gave a lunge and jerk, and threw me against the back of the seat, and pitched me forward and across my bundles. I fell to the floor, fell foremost across the bundles, and I had the gun in my hand, and the gun hit the side of the seat as you go out in the aisle, and I fell right over that, and it struck me right in the side, right there (indicating the groin) in the lower abdomen in the left side. Then I tried to get up, tried three or four times to get up, and there were two men standing right in the aisle as you go out at the men's toilet, and there was a lady sitting right there as you go out, and she said to me, 'Are you hurt?' and I said, 'No, not much,' or something like that. And those two men looked around at me, and I asked them if they would help me. I was sick and blinded and could not get up, and they taken hold of me and helped me out of the car. They helped me to the ground. After I got upon my own feet and the wind struck me, I was not so blind. After I got out I was not so sick, and the men asked if I wanted them to help me in the depot, and I told them I didn't; that I wanted to get to my daughter's. And about that time there was a man came up and asked what was the matter—he was an elderly looking man—and these two men said, 'The lady is sick,' or 'hurt'; something like that; and he said, 'Do you want me to help you?' And I said, 'No, I want to get to my daughter's.' And about that time Sam Stillings came around the corner of the depot, and I said, 'Here is Sam. I will get him to take me out home;' and Sam came walking up, and I got in his car and went out to my daughter's. From the time I fell there was something seemed like gave way in my back, and this side of me, where I struck the seat on the car, was all numb; didn't have no feeling; even to my tongue was numb. I still held onto the gun until I got to my daughter's, but I did not have a bit of feeling in my right side at all. My daughter lives about a mile from town. I went there in an automobile with Sam Stillings. I was not long in going. After arriving at my daughter's my condition just kept getting worse all the time; I was numb; had not come to my feeling, and was sick, and was in pain all over. That is all there is to it; I was in pain all over, suffering with my back in the lower part of me; seemed like it was all going to pieces. I did not lay down just the minute I went in the door, but kinder walked around and thought maybe I would get better, and I taken the baby out of her arms, and it kinder made me sick, and I taken her and laid down on the cot that was there. and got in so much misery I could not lay there, and got up again, and had such awful cramps, and was in so much pain I could not be still, and I got worse from that time on. I kept getting worse all the time from then on, from the time I laid down on my cot, kept getting in so much pain. The longer I laid the worse I got, and I got up again and had cramps so bad I went to the toilet, and kept going back and forth to the toilet,

and did not get any better, and along in the day—I don't know what time it was—I did not get any better, and the last I remember my daughter was covering me up. I had cramps all through my stomach and back, and felt like I was in so much pain I couldn't hardly stand it. I had cramps in the lower part of my bowels. I lost consciousness; did not know any more. After I had the miscarriage I did not know any more. That was when I was at the toilet. I do not know how long it was until I regained consciousness. I don't know how long I had been there when I finally came to myself, but I believe the next thing I knew Dr. Nelson and Dr. Spear were there. I am not sure; that is the next thing I remember. When I regained consciousness I was confined to the bed. I would come to myself, and then go off in a dream again. I was confined to my bed at my daughter's 10 or 11 days; I do not know just how many days it was. I suffered pain the whole of that time I was in bed. I suffered pains all through my back and the lower part of my stomach, my bowels, my head, and my neck. My neck seemed like it was jerked loose from my shoulder, and this misery in my side was very bad; and it seemed like everything in me was tearing out. From my daughter's my husband took me to Houston. After I got to my daughter's, and before I lost consciousness, I had some hemorrhages. When the men raised me up on my feet I felt something come on, and that scared me, and I was so scared something would happen to me right there in the street, or at the depot, or in the car, and that made me a heap more nervous than I would have been. I thought something would happen to me right there, and I told them I felt sorter weak, and I didn't know whether I could get to the car or not, and he taken my bundles. I don't know whether anybody helped him to get my bundles in the car, but I know that I held onto the gun myself. Those hemorrhages I had were on the occasion of my visiting the toilet, but this came on me as soon as the men raised me to my feet. Prior to that time I had missed some periods, of what are known as the 'monthlies,' for 3 months. I had missed them three times. After this injury menstruation has set in again, after I recovered from it. After I got to Houston no doctor there waited on me; I was still taking Dr. Spear's treatment. Since I have been to Houston I have been taking treatment from Dr. Sinclair for three or four months. I do not know how many times Dr. Spear visited me at Liberty. I do not remember seeing him but one time.

"Prior to May 4th, when I received this injury, I had good health, and could do as much work as any one. I had never had any medical treatment before that in this country. Ten years ago, when my little boy was born, was the last time I had had a doctor. I was able to do any kind of work. I could take a mule team and rake hay, or stack hay, or haul hay, or chop cotton, or wash and iron, or general housework. I did all my housework before that. Since I received this injury I have not been able to attend to my household duties, only barely creeping around. I have not got any health now. For one thing, I am so weak in my hips I cannot walk around, and have such hard bearing down pains that I have to hold my abdomen to walk, and getting up and down steps I have to pull up and down, and I have not got no health, and that is all there is to it. I did not have any occasion whatever to observe any indication of bruises on my person after I got to Houston, because my husband and another young man carried me into the house after I got home, and I was in bed for a week or such a matter. I could not tell when I first noticed indications of bruises on my person. It was 8 or 10 days before I attempted to take a bath by myself, and then there was a great big place where the gun struck me, and across my limbs there were

blue spots, and on my shoulder it was all green, like the places on my knees; I don't know whether hitting the suit case or the box caused that or not. I suffer pain now all through me. in the lower part of my abdomen, and through my back, and my back and hips are so weak and numb, and I have not got any feeling in my hips and back. I was under Dr. Sinclair's treatment in Houston, but before he commenced a couple of doctors came out there. Dr. Armstrong, I believe was one of them, and he examined me. Before he examined me I felt a little better, and after he examined me I seemed to get worse. I am still under Dr. Sinclair's treatment when I am at home. My age is 43. I was 42 at the time I received the injury. I have five children. I left Houston that morning on the train that reached Liberty about 8:30 or 9 o'clock. I live on Twenty-First street. I could not tell how many miles that is from the depot; could not judge in miles, because I don't know. * * * I came from home to the depot on the street car. I brought my bundles with me. My husband and another laboring man were going to work, and he helped my husband carry my bundles to the street car, and my husband helped me on the train. I packed my grip and bundles the day before. I was getting ready to come over and visit my daughter. This bundle of dishes that I had was not a purchase that I had made. It was a bundle of dishes containing a 31-piece dinner set. It was a new purchase. I had not been shopping. I did not buy it myself. Mrs. Warmon had got it as a premium from the Jewel Tea Company. I expect it had been in the house a week or 10 days. The dishes were not very heavy. Counsel can imagine how heavy they were. They were in a box maybe about 16 inches square. My grip was a suit case, pretty good size, and then there was the gun. It was a pump shotgun, rolled up in a paper and tied. I don't know whether it was double-barreled or not. I know that they shoot shells in it.

"I did not ask anybody to help me off the train until I asked these two men. I thought the conductor always did that. I had not called attention to anybody that I wanted assistance. When I got up to leave my seat the train had stopped right by the depot. When the station of Liberty was announced I did not then get up and make preparations to leave the train. I did not get up until the train stopped. The train had not been standing there very long before I got up, but long enough for a lot of men to get off. I could not say how long. During all the time the train was standing there I was trying to get off the train. I don't know what I was doing after it gave that lurch or jerk. After the train stopped I taken up my bundles and had the gun. I went to get up when the train stopped, as it was time to get off. I guess somebody except myself had gotten off when the train started again. I did not see any one get off. Of course, after I got hurt I did not look to see what was going on then, because all I was thinking about was getting off. I could not say approximately how many passengers had descended from the train at the time I attempted to get off. I know there was a gang of men got off. I know there was a lot of men got off, but I never saw a woman get off. I do not know whether they were passengers or work hands. I do not know any of the men at all; did not know any of them. I have no idea how long it was after the train came to a stop before it started again. I don't know how long I was trying to get off before then. While the train was standing there I was getting up my bundles. It would take a minute or so to get off. and when I got it all gathered up I made my attempt to get off, and the train done like that, and it threw me against them, and that made me longer in getting off. It seemed to me like the train moved a good ways after it started again, for I thought it was gone with me. It

moved as far as from here to that old gentleman sitting over there. I do not know whether that is as far as 20 feet, because I am no judge of feet, but it seemed to me like it. It moved far enough to throw me face foremost. and if I had had a kid in my arms it would have broken its neck. I am trying to tell counsel the best that I know how. The gentlemen that assisted me from the train were standing right as you go out of the door, in that hallway. They were passengers. They got back on the train afterwards. They had not gotten off. They did not get off after they helped me off. They were standing in the aisle. I don't know what it did to them. I did not pay any attention to anybody but myself. I never saw any of the other passengers knocked down there, because these two men were the only men that I saw standing up. I never saw any women folks standing up. I never looked back to see what was going on in the back of the car. I do not know who those gentlemen were. I had never seen them before that, and have never seen them since. I do not know where they were going. I did not ask them where they were going. I did not ascertain their names. I never thought about it. * * * I did not say a while ago that I told Mr. Stillings that I was hurt on the train. I don't remember whether I said anything to him or not. I said to him, 'I was so nervous I did not believe that I could get to the car.' I don't know that I said that, but I think that is it. I always called him 'Sam.' * * * I did not say anything to Mr. Stillings at that time about being hurt on the train. I never mentioned it to him. because I did not propose to tell a young man my condition that way. * * * After the birth of the little boy who is now 10 years old I had had no more children. I had not conceived since his birth until this last time, when I got hurt on the train. There was a period of approximately 10 years between the birth of my last child and my last conception. I was with child at the time this injury occurred, on May 4th. I think the date of my last conception was about the 12th of February of this year. I was then past 42 years of age. There had been a period of 10 years approximately since the birth of my last child before my next conception. I had been in good health at that time. My female organs had been unimpaired. I guess that last conception was an accident. I had purposely prevented it for a period of 10 years. I was really not expecting anything of the sort at that age. When I got to my daughter's on this occasion after stopping at Liberty, I stayed up a while. I don't know just how long it was. I was up and down from the time I laid down on the cot, off and on all day. I reached my daughter's something about 9 or 10 o'clock. When I got to my daughter's about the first thing I remember of doing was taking my daughter's baby and loving it. She has three children; one is about 6 years old, and one about 2 years old. I went to bed before noon. I laid down off and on all the time from the time that I first got there; laid down and raised up and down, all the time. I did not get up and get down off and on all day. I do not know just what time it was when I got so I could not go back and forth to the toilet; did not pay attention to that. I just played with the baby a few minutes. I did not carry him around over the place. I took the baby in my arms and got so weak in my back I laid down on the cot with him. I did not play with any of the other children. There were not any of them there. As to how much I was up that afternoon, I don't know whether there was any afternoon or not; do not hardly remember, but I was up and down off and on until I had to lay down again. "I say I had a miscarriage. I had it at the toilet. I know because I have had children enough to know that I had the right kind of misery to bring on such as that, and I know that something passed from me. I had never brought on anything like that before this injury. I know just about the kind of pain I had, and when that passed from me I did not have such hard pains any more. It was not a very big fœtus; it was not very far advanced. I do not know about whether it had hardly any form. It was a slug of something. I thought because I was having a discharge that I had a miscarriage. I knew I did. I never was that way before. I know I did have a miscarriage. I did see something except the blood. I saw a slug or something that had passed from me. It was a slug of something. I did not take it up and examine it, but it was about that big. I did not examine it. I was too sick. * * * I do not know what time of the day it was that that happened, but it was along about the middle of the afternoon, as well as I remember. As to whether it was as late as 2 or 3 o'clock, I could not say what time it was, for I did not pay any attention to the time of day. As well as I remember it was about the middle of the afternoon of the same day I got to Liberty. The toilet I was in was an old toilet, sitting out from the house. It is an old place that everybody was using—the whole family. It was not in a foul condition at that time. I know what counsel means by being in a foul condition. Nobody was at the toilet with me right at the time that it happened. My daughter had been going back and forth with me, and the baby got to crying, and she went back to the house, and that was the last time that I was at the toilet. When I got back to the house the last I remember she was covering me up in the bed, and I never went back to the toilet any more after that. I did not send for any doctor. Mr. Warmon, my son-in-law, did send for a doctor. I do not know about when it was that he sent for the doctor, only what they told me. Dr. Nelson came—they told me he came. I do not remember seeing Dr. Nelson that day. I remember his being out there one day while I was sick, but not that day. I do not remember talking to him at all, and do not even remember of seeing him that evening. I did not see him that evening. I do not remember whether it was the next day or not that I saw him. * * * I cannot remember whether it was 1 day or 4 days or 5 days before I saw Dr. Nelson. I do not remember how many days it was. I know it was not that day, but I don't know whether it was the next day or not. I know it was not the day that I got hurt, because they had not yet sent after the doctor. * * * I remember seeing Dr. Spear once. I do not remember his being there but one time, but my daughter says that he was there more than once. Once is all I remember seeing him, and that is the day that he came out with Dr. Nelson. I do not know how long I took Dr. Spear's treatment after I went back to Houston. I had a bottle about that large (indicating a bottle about the size of half a quart) of some kind of medicine that he gave me. I don't even know what it was, and don't know what it was for. I am not sure how long I continued to take his medicine, because I have taken so much medicine, and I don't know what kind it was. I don't know anything about how long he treated me. * * * I do not know how long it was after I went back to Houston that Dr. Armstrong examined me. My husband could come closer to telling that. * * * I expect it was a month or more after that before I sent for Dr. Sinclair, because we kept waiting on them to come back. They said they would see that I got the right kind of treatment. * * * Some days I am not as numb in my hip and back as others, but it hurts me to walk all the time. I have to hold myself in there, to hold my bowels. if I do not have anything tight on me. It seems like everything in me is coming out, and my hip and back are so numb and weak I can hardly use them. My menstrual

periods are regular now. They come on at regular periods now, since I got well, since the flow stopped. They have been regular all my life, and I had the flow about 6 weeks, and after that I have been well ever since. By 'flow' I mean that discharge. * * * Since approximately 6 weeks from the 4th of May of this year my menstrual periods have been regular and perfect, and nothing at all the matter with them. I am still guarding myself against conception. I am determined to prevent conception the same as before. I do not know about whether I am unable. I could not tell counsel whether I am in such condition that I could not conceive. I have purposely avoided conception since then."

There was no statement by the plaintiff of any fact which would lead any person to believe that she had told or indicated to her daughter at Liberty the fact of her miscarriage.

Dr. Sinclair testified for the plaintiff, and also Dr. Nash. Dr. Sinclair was her regular attending physician. Dr. Nash called upon Mrs. Stephens a very few days before the trial of this cause, and for the purpose of being a witness in this cause, and Dr. Nash did not treat Mrs. Stephens at all or give her any medicine. His entire testimony is as follows:

"I never did treat Mrs. C. Stephens professionally, but I made an examination of her on or about the 1st day of August, 1916, and found her suffering with an inflamed and enlarged uterus; also an inflamed condition of the pelvic tissues, together with inflammation of the tubes. A blow received by falling upon a shotgun that had been taken apart and was in a case, striking one end of said case on her left side and abdomen, and the other end of said shotgun case being on the floor, causing her severe pain and injury, could and would probably produce a miscarriage to a woman in a pregnant condition, and who had been pregnant for four months before. Such miscarriage would probably manifest itself first as follows: The patient immediately following the injury would likely suffer with a fainty weak spell, followed probably within a few hours with cramps or pains in the lower bowels, and backache, with probable hemorrhage. In the event a person had suffered miscarriage from receiving the blow or injury hereinbefore indicated, the natural or probable consequence of same would be great pain and of a severe character. The said Mrs. C. Stephens gave me a history of her case. She said that she had been in perfect health for some 8 or 10 years, and had missed her monthly period before the accident something like 3 or 4 months, and since her injury her monthlies are regular, but suffered with more or less pain in her hips, back, and lower abdomen.

"My opinion as a medical expert and physician would be that Mrs. C. Stephens suffered a miscarriage as a result of the injury she claimed to have received, judging from the history that she gave me, and judging from the symptoms, signs, and conditions that I found her in. From the condition I found the female organs in, and from the history that she related to me, weak spells, fainty spells, followed with the pains in the lower abdomen and backache. It leads me to form the conclusion that she had suffered a miscarriage. These are the probable symptoms of a miscarriage. I have answered as to the examination by me of Mrs. Stephens and the condition of her female organs that I found, and a miscarriage would probably cause the same. The affectations that I found of the female organs or parts of Mrs. C. Stephens could and probably would have been brought about by such an injury as she may have received, as hereinbefore stated, in the railway car at Liberty. In my opinion, judging from the history of the case as I have testified about herein, and also from the symptoms that I observed, said affected condition of the female organs of Mrs. Stephens might be, and very likely would be, brought about or caused by said injury, and be the result of said injury. In the event that Mrs. Stephens received such injury as has been described in the passenger train at Liberty, Tex., and now suffers pain in her back, hip, thighs, and abdomen, and in the event the said Mrs. Stephens up to the time of said injury, and for the past 7 years, had been in good health, and had never had cause to have a doctor treat her for anything, and in the event she had never suffered such pain prior to said injury as she now suffers and has suffered since, I would attribute such pains as she now suffers to a miscarriage, as the only causes to bring about such condition would be an infection after childbirth or following a miscarriage. It is hard to say how long her present condition will last. I would expect her to remain in bad health for maybe 3 or 4 years after change of life, or maybe the balance of her life. The injury would be probably more or less permanent. If Mrs. Stephens had suffered a miscarriage from said injury, I would expect the said injuries to be more lasting in a woman of her age than in a younger woman, from the fact that nutrition is less active and vitality lower. If Mrs. Stephens had been in good health up to the time she received the injuries, the affectations I found of her female organs would be brought about by the injuries, in my opinion. I did find the female organs affected, and in my opinion it was brought about by the injuries she received, taking into consideration the history of the case. I became acquainted with Mrs. Stephens about August 1st, in the town of Liberty. I did not treat Mrs. Stephens professionally at any time prior to the 4th or 1st of May, 1916. I did not treat her after the 4th of May, 1916, but I made an examination. I do not know who was the first physician who treated plaintiff's wife, Mrs. Stephens, at the time she claims to have been injured, nor how long such physician continued to treat her.

"Q. The plaintiff's wife claims to have been about 43 years of age at the time she claimed to have been injured on May 4, 1916, and she also claims that she is the mother of five children, several of whom are grown, and the youngest of whom is about 10 years of age. If it be true that plaintiff's wife at the time she claims to have been injured was about 43 years of age, and if it be true that she was the mother of five children, several of whom were grown and the youngest of whom was then 10 years of age, and if it be true that she had not been pregnant with child for a period of at least 10 years prior to her claimed injury on the 4th day of May, 1916, then you are asked this question: Is it probable in your opinion as a physician that the plaintiff's wife was pregnant with child on the 4th day of May, 1916, as claimed by her? In other words, considering plaintiff's wife's age of approximately 43 years, and the fact that it had been 10 years or more before her claimed injury since she had been pregnant with child, would you as a medical man, based upon your experience and observation, expect to find a woman of the age stated, and who had not been pregnant with a child for so many years, to be in such condition with child at the time plaintiff's wife claims to have been injured? If you answer that you would reasonably expect such condition to exist under such circumstances, then you will please state whether such condition would be usual or unusual under such circumstances. A. I would reasonably expect to find her in such condition. I would consider it rather unusual, but we do observe such cases occasionally.

"I did not treat plaintiff's wife. I did not see a miscarriage or any fœtus. It is unusual but probable to find women of between 43 and 45 years of age in the condition in which I found plaintiff's wife, as to her female organs, at the time I examined her. I found an inflamed and enlarged uterus, and also an inflamed condition of the pelvic tissues, together with inflammation of the tubes. I have seen such abnormality in other women in my practice as a physician. It is unusual but probable to find women between 43 and 45 years of age, who have grown children, but who have not been pregnant with children for approximately 10 years, to again become pregnant with child after reaching such age, and after such a long period of nonpregnancy. Such cases are not frequent. They are rather rare. * * * It is a fact that I could not say and would not say, without the history of the case and the history of the accident, that Mrs. Stephens miscarried at or about May 4th, or that she was pregnant at that time. Taking the conditions that I found her female organs in, and with the history of the case and the accident, my conclusions would be that she had a miscarriage. It is true that women about the age of 45 cease bearing children, and it is also true that some women about that age do have bad health, but it is not a fact that women reaching the age of 45, who have normal, healthy female organs, suffer any bad health by reason of such change of life. If it be true that plaintiff's wife was a woman in vigorous health at the time she claims to have been injured on the 4th day of May, 1916, and had been for a number of years prior thereto, as claimed by her, in my opinion as a physician a miscarriage on her part, if there was one, will probably cause permanent injury."

As to the testimony with reference to the condition of plaintiff, and as to whether the examination showed the probability of her having miscarried on the 4th of May, 1916, Dr. Armstrong, a physician of Houston, testified plainly that it was not possible, under the circumstances, and without setting out in detail the testimony of Dr. Armstrong, he claimed that the examination showed a former injury of long standing to the female organs of the defendant in error, but that they neither occurred recently, nor could they have brought about the miscarriage complained of. Dr. Armstrong, in addition, testified:

"I was examining this lady, of course, for recent injuries, and the laceration, of course, had nothing to do with an external violence. It was the result of childbirth. Such a thing as that might have been caused as recently as May 4th before, if she had had a full term child at that time. That would be the only way—a practically full term child. There are two ways for persons to have a laceration. One is by some one taking a knife or scissors, or using force to stretch it, or either, from childbirth, and that is what is meant by it. I noticed that at once, and then on examining more deeply I found that there had been a tear at the neck of the womb, that portion that protrudes into the vagina, and this was especially marked on the left side, and there was a hard scar there. That was an old condition. That also followed from childbirth, and it always does follow either from childbirth or some instrument being used to stretch the little opening in the womb. In a normal woman the opening is about the size of a lead pencil, or a little smaller. The average opening is no larger than a small lead pencil. This had been torn and was flared open on one side, as I remember it. It was a scar, giving a hard feeling to the place. As I said, that is unques-tionably due to childbirth, and is of long standing. It usually does occur when the first child is born. That is when most of the accidents happen. Upon going more deeply I found her womb was turned back a little bit, was enlarged a little bit, and was turned back toward the rectum. * * * This condition that I have spoken to you of is one that doctors usually find, and is extremely common, and is the basis of a large portion of the surgery you hear of done on women, and is the result of laceration, where she let infection spread from an open wound and caused a mild amount of inflammation and adhesions around those parts. Taking into consideration the findings I had there, and the plain fact that they were of long duration, and no evidence of anything that could be called quite recent, I concluded that it was one of the usual conditions we find in women who have been the mother of many children, and probably have not had the professional and scientific care they should have had, and could trace no connection, and I state that there was no connection directly between the injury found there and any recent injury she might have had. * * * I regarded the condition of the womb, this old tear that I have stated, and the turning back toward the rectum, as of long standing. That condition could not have been caused so recently as the 4th of May before the examination. I want to be perfectly fair. Assuming that the soreness Mrs. Stephens complained of, of extreme pain, was just as she claimed it to be (and I do not say it was not), it is possible that that condition might have been aggravated quite recently. I think that is fair and proper to make. There is no evidence that such is the case, but it is possible. It being admitted that Mrs. Stephens was the mother of five children, the youngest of whom was 10 years of age, and it being in evidence that she had not conceived or become pregnant with child for at least a period of 10 years prior to the alleged injury, taking her condition as I found it with reference to her female organs, including this position of the womb and the other injury, and the tearing of her peritoneum and other departments, and the fact, of her age, approximately 43 years, and the fact that she had not conceived for a period of 10 years prior to this claimed injury, it would be extremely improbable that she was pregnant with child at the time of this injury in May, 1916. I will not go so far as to say that it was absolutely impossible, but it would be extremely improbable. With reference to the position of the womb and its old injury, whatever it was caused by, outside of the question of age and outside of the question of the long lapse of time that intervened since the birth of the last child, in my opinion as a medical man conception probably would not take place. Dislocated as it was and turned back toward the rectum, it would be highly improbable that conception would take place."

Therefore it will be seen that the testimony of the physicians was, perhaps, the most important part of the entire investigation. As stated before, Mrs. Stephens did not tell her daughter at Liberty that a miscarriage had been had by herself. The first physician, Dr. Nelson, who attended her, stated, that no complaint was had or made to him by Mrs. Stephens that she had miscarried, and the testimony of Dr. Nelson and Dr. Armstrong was sharply in conflict with the testimony of Dr. Sinclair and Dr. Nash. That being the state of the record, and under the circumstances in which this testimony was admitted, it then became exceedingly material and important as to whether the court

should admit the testimony of Dr. Nash, who examined her only a few days, perhaps one or two, before the trial of this cause.

The courts have been invoked on this proposition as to whether a physician who made an examination for the purpose of testifying only, and who did not treat the patient personally, whether his testimony was admissible, being confined, almost exclusively perhaps, to the statements of the witness, and not being founded on any exclamation of suffering, which is supposed to give rise to the exclamations or statements, whether these statements are admissible a long time after the supposed injury occurs, and, as we say, being almost solely based upon the statements of the witness, over the objection that they are hearsay and self-serving, and being followed usually by the testimony of the witness on the stand, and therefore perhaps having a tendency to bolster up the testimony of the witness herself, whether or not, in any event, testimony of this character should be admitted in tne trial of the case. In the case of Williams v. Great Northern Railway Co., 68 Minn. 59, 70 N. W. 862, the Supreme Court of Minnesota uses the following language:

"The question as to the circumstances under which expressions or declarations of pain and suffering are admissible in evidence in behalf of the person making them is one of much importance, especially in view of the rapid growth of personal injury suits, and the increased frequency with which physicians are called as expert witnesses. At the outset it is necessary to note the distinction, often overlooked, between mere descriptive statements of pain, or other subjective symptoms of a malady which furnish no intrinsic evidence of their existence, and those exclamations or complaints which are the spontaneous manifestations of distress, and which naturally and instinctively accompany and furnish evidence of existing suffering. Exclamations and expressions of the latter kind are the natural language of pain; and, whenever its existence at any particular time is a relevant fact, such manifestations of it are always admissible as original evidence, under the ordinary application of the rule of res gestæ. They are in the nature of verbal acts, and may always be testified to and described by any person in whose presence they were uttered. We take it that it is expressions of this nature to which Mr. Greenleaf refers when he says: 'Whenever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings, made at the time in question, are also original evidence. If they are the natural language of the affection, whether of the body or the mind, they furnish satisfactory evidence, and often the only proof, of its existence; and whether they were real or feigned is for the jury to determine.' Greenl. Ev. § 102. It may not always be easy to draw the line between such complaints or expressions and mere descriptive statements, but the authorities all recognize and make the distinction, which is one that accords with the experience and observation of every one. Hagenlocher v. Railroad Co., 99 N. Y. 137, 1 N. E. 536; Roche v. Railroad Co., 105 N. Y. 294, 11 N. E. 630 [59 Am. Rep. 506].

"The question when, if ever, mere descriptive statements of pain or other subjective symptoms of malady are admissible in evidence, is one of more doubt and difficulty. In the latter part of the section just cited, Mr. Greenleaf says: 'So,

also, the representations by a sick person of the nature, symptoms, and effects of the malady under which he is laboring at the time are received as original evidence.' 'If made to a medical attendant, they are of greater weight as evidence; but, if made to any other person, they are not on that account to be rejected.' This cannot be sustained under the rule of res gestæ. It is therefore clearly an exception to the rule excluding hearsay evidence. Various reasons have been advanced for making the exception. One is that as the opinion of a surgeon or physician as to the condition and symptoms of his patient and the causes and nature of his malady is clearly competent, as coming from an expert, and as this opinion must necessarily be formed in part on the statement of his patient as to subjective symptoms, it would be unreasonable to receive the opinion, and exclude the reasons or grounds on which it was founded. This is all true, but it furnishes no ground for permitting a physician, any more than any other expert, to give an opinion founded on hearsay evidence. When evidence has been introduced on the trial, tending to prove that certain symptoms in fact existed, it is, of course, competent to show that their existence was communicated to the physician for the purpose of showing all the grounds upon which he based his opinion. Another reason sometimes advanced is that where statements are made by a patient to his medical attendant, with a view to be acted on in a matter of such grave personal concernment to the patient, he has a strong and direct interest to adhere to the truth. This may go to the weight of the evidence, but not to its competency. Moreover, these reasons are not as broad as the rule. A third reason, and probably the principal one, for making the exception, was founded on the supposed necessities of the case, to wit, that symptoms of a malady are usually, in part subjective, which can only be ascertained from the statements of the patient himself; and, as he could not testify in his own behalf, the only way in which these symptoms could be proved was by evidence of his complaints to others.

"Abuses resulting from receiving in evidence simple descriptive statements of pain and suffering, or other symptoms and effects of an injury or malady, and the fact that the necessity for their admission has been mainly removed by statutes making parties competent witnesses in their own behalf, have led to a re-examination and material limitation of the former rule. According to the great weight of modern authorities, the mere descriptive statements of a sick or injured person as to the symptoms and effects of his malady are only admissible under the following circumstances: First. They must have been made to a medical attendant for the purposes of medical treatment. Second. They must relate to existing pain or other symptoms from which the patient is suffering at the time, and must not relate to past transactions or symptoms, however closely related to the present sickness. This was probably always the rule, but the courts are now disposed to apply it more strictly than formerly. Third. Such statements are only admissible when the medical attendant is called upon to give an expert opinion based in part upon them. He cannot merely testify to the statements, and then stop. In the absence of any expert opinion based on the statements, they stand on the same footing as if made to a nonexpert witness. We find no case which expressly and directly announces this proposition, but we think it is clearly implied, and logically follows, from the fact that such statements are held to be admissibe only when made to a person of scientific medical knowledge. Moreover, there is a practical reason for such a rule. A physician has both the ability and opportunity of observing and ascertaining whether the patient's statements of subjective symptoms correspond with the objective symptoms, and hence of forming a fairly accurate opinion as to whether such

statements are true or false; and when he comes to give his expert opinion, presumably he will base it on such statements only so far as he believed them to be true. He might truthfully and safely testify that the patient made certain statements to him, and yet be unwilling to venture an opinion that they were true, or, if true, that such symptoms were caused by or in any way connected with the injury complained of.

"So far as we can discover, this is as far as any of the courts have ever gone in modifying or limiting the former rule on this subject, even in jurisdictions where parties are competent witnesses in their own behalf. Some of these limitations are perhaps illogical and inconsistent on principle with the retention of any part of the old rule. Strong reasons can be urged in favor of wiping out the rule altogether, and putting statements to medical attendants on the same footing as those made to any one else, and holding them competent only when admissible under the ordinary application of the rule of res gestæ, and thus place the whole subject under the general rule of evidence. If the question was res integra in this state, we are strongly inclined to think that we would so hold; but we have repeatedly held, expressly or impliedly, that statements made in the manner and under the circumstances above indicated are competent evidence."

The courts of our own state have held in conflict on the proposition that a physican called in long after the injury was sustained, and called only for the purpose of testifying in the case, and some are held to be admissible and in other cases they were not admissible, but the indications are, to our minds, and the better and more satisfactory conclusions have been reached in the cases in which those statements have not been admitted. In the case of St. Louis Southwestern Ry. Co. of Texas v. Martin, 26 Tex. Civ. App. 231, 63 S. W. 1089, Chief Justice Garrett of the Galveston court held as follows:

"An examination of the bills of exceptions shows that a portion of the testimony complained of was improperly received. The statement to Mrs. Arnold that she would take spells of hurting was not admissible. What she told Mrs. Finley about how she was getting along was not proper testimony 'as to the expressions of pain, but may have been so near the time of the alleged injury as to have been admissible in rebuttal of defendant's testimony that she made no complaint. The same may be said of a part of the testimony of H. G. Finley. The testimony of the plaintiff seems to have been admissible as showing that his wife was complaining of pain that she was feeling at the time of the expressions testified about. The declarations of a person suffering pain are admitted upon the principle of admitting evidence of res gestæ, and the limitations upon the admission of such testimony clearly appear from the authorities above cited. Such statements must be expressions or complaints made at the time, and the natural and instinctive manifestation of pain and suffering. But the same principle does not apply to statements made to an attending physician, because he testifies as an expert, and his opinion must be based upon data furnished him. A learned discussion of this question, as well as of the admission of statements as to bodily pain, will be found in Williams v. Railroad Co. [68 Minn. 55] 70 N. W. 860, 37 L. R. A. 199, decided by the Supreme Court of Minnesota, in which it was held that mere descriptive statement of pain or other subjective symptoms of malady made to an attendant physician, and upon which he bases his opinion as an expert, are admissible. In Railway Co. v. Rose,

19 Tex. Civ. App. 470, 49 S. W. 133, the opinion of a physician based upon a history of the injury and a description of his symptoms from the time of the accident up to the time of the examination related to him by the plaintiff was held proper evidence. A writ of error was refused in this case. But it does not appear that what the plaintiff told the witness was repeated by him to the jury, or under what circumstances Dr. Rosser made the examination. It was held by the Court of Civil Appeals for the Fourth district in Railroad Co. v. Wheeler, 41 S. W. 517, that, when the witness has been employed by the plaintiff to make the examination for the purpose of testifying in the case, such statements are inadmissible. On writ of error to the Supreme Court that court declined to consider the question. 91 Tex. 356, 43 S. W. 876. Statements made to a physician as to symptoms and past suffering are no more admissible as evidence in favor of the injured party than if they had been made to some other person. They are only admissible for his information, in order to enable him to form an opinion. If they are made to him in the course of treatment, they come within the exception. But, when the physician had been employed by the plaintiff to make the examination for the purpose of testifying in the case, such statements should not be admitted. At the trial below, Dr. Bell was permitted to testify, over the objection of the defendant, after it had been shown that he made the examination for the purpose of testifying in the case, that the plaintiff's wife complained that the condition of her back was the same that it was a year ago; that she told him that the pain was located, as she thought, right where it was when he saw her before; and that the character of pain was sharp, the same as before, etc. These statements of Mrs. Martin, in so far as they related to past suffering, were inadmissible, as self-serving and hearsay, having been made for the purpose of enabling Dr. Bell to testify upon the trial of the case, and should have been excluded."

So, in the instant case, in our opinion, the testimony complained of as to Dr. Nash should have been excluded. In Wheeler v. T. S. E. Ry. Co., 91 Tex. 356, 43 S. W. 876, the Supreme Court of this state, through Judge Brown, used the following language:

"That portion of the testimony objected to is as follows: 'I believe that there are no other symptoms that you have not asked me about, except that he complains all the time with a roaring and a dull, aching pain in his head, more especially in the back of his head.' The defendant objected to the testimony (1) because it was hearsay; (2) because it was evidence with respect to the symptoms of a disease or injury not testified to by the plaintiff—which objections the court overruled. Wheeler recovered judgment in the district court, from which an appeal was taken, and the judgment was reversed by the Court of Civil Appeals of the Fourth Supreme Judicial District on account of error in admitting the foregoing evidence. The evidence of the witness, Dr. Driskill, which was objected to by the defendant in error upon the ground that it was hearsay, is stated in the bill of exceptions, as above copied, as follows: 'He complains all the time with a roaring and a dull aching pain in his head, more especially in the back of his head.' We understand from this language that, while the witness was engaged in examining the plaintiff at the several times named by him, the plaintiff complained of a roaring and pain in his head. This indcates that the pain of which he complained was present at the time that the complaint was made, and that the complaint was not a recital of what had transpired, nor a mere statement of existing conditions, but was the natural expression pro-

duced by the sensation of roaring and pain in the head at the time; that is, that the complaint made was induced by the roaring and the pain as it then existed, and that the complaint itself was in fact a part of the res gestæ, and therefore not subject to the objection that it was hearsay. Railway Co. v. Brown, 78 Tex. 397, 14 S. W. 1034; Railroad Co. v. Shafer, 54 Tex. 641. Upon the argument of the case in this court the defendant in error urged the objection to the testimony that at the time the plaintiff made the complaint testified to by Dr. Driskill the latter was engaged in examining the plaintiff for the purpose of testifying in his case, the witness being employed by the plaintiff for that purpose. The plaintiff in error met and combated that proposition as if it had been properly presented. We presume that the same course of argument was pursued in the Court of Civil Appeals, and that this led the honorable Court of Civil Appeals to place its decision upon the ground stated; that is, that the witness Driskill being, at the time the declarations were made, employed by the plaintiff to make an examination of him with a view to testifying in the case, and being at the time engaged in that examination, the complaints of the plaintiff, made under such circumstances, were not admissible in evidence. The objection presents a very interesting question, and Chief Justice James in the opinion prepared by him discusses it in a very clear and able manner; but we do not feel authorized to consider it in this case, for the reason that it was not presented to the trial court, and not embraced in the bill of exceptions taken to the evidence of the witness. It is the well-established rule of this court that, upon a bill of exceptions to evidence admitted, this court will consider only such objections as were presented in the trial court and as are stated in the bill of exceptions. * * * In [the case of] Rector v. Hudson [20 Tex. 237], the objection presented to the evidence was that the declarations offered were made by one who was not a party to the suit. This court held that an objection based upon the fact that it did not appear that the declarations were made at the time of the transaction could not be considered under the bill of exceptions, and the court said: 'If the objection had been that they [the declarations] were not made at the time, it might have been brought out by an examination of the witness to that point that the admissions of the party that he had bribed the rider, which was a material part of the declaration deposed to, was made at the time of the principal transaction, or in such time as to have been plainly admissible in evidence. It has been constantly held that in revising the ruling of a court in the admission of evidence, the appellate court will consider only the objections to the evidence taken at the trial.' "

Therefore the Supreme Court, in passing upon the matter, did not squarely pass upon the question, although in a manner raised in that court. In the case of M., K. & T. Ry. Co. v. Johnson, 95 Tex. 411, 67 S. W. 768, Judge Williams used the following language:

"One of the questions over which there was a sharp controversy in the trial was as to the extent of the injuries and damages sustained by defendant in error. A bill of exceptions in the record recites that Dr. Field was introduced as a witness in favor of plaintiff below, and testified that about six months before the trial he had examined plaintiff for the purpose of ascertaining the nature and extent of his injuries, not for treatment, but only in order to qualify himself to testify as an expert in the trial; 'that on such examination plaintiff complained of suffering considerable pain in certain portions of his back, and, when he [witness] would stick pins in him along his right leg, he would exhibit no signs of suffering pain, but, when he would stick pins in him at corresponding places on his left side, he would flinch and complain a great deal.' The bill of exceptions further states that before the introduction of this evidence, the defendant objected to the witness testifying to anything plaintiff said, and to anything plaintiff did while he was being examined by physicians for the purpose of testifying in the cause and not for the purpose of being treated, on the ground that the evidence would be self-serving, hearsay, immaterial, and irrelevant, and that the objection was overruled; the court holding 'that everything that plaintiff said and did to the physicians while being examined under such circumstances would be admitted.' Plaintiff was injured August 16, 1899, and the trial occurred in March, 1901. The examination made by Dr. Field, therefore, took place more than a year after the plaintiff was hurt. The evidence of Dr. Field, as set forth in the statement of facts, states the appearances of a previous injury to plaintiff's back still existing when he made the examination, and proceeded: 'He complained of considerable pain, and, upon any attempted movement would complain a great deal.' Then follows the statement copied in the bill of exceptions. This writ of error was granted because the court thought there was error in the admission of the mere declaration of plaintiff of the fact of his suffering pain, made to an expert, on an occasion prepared by himself, for the sole purpose of furnishing the expert with information on which to base an opinion favorable to plaintiff. That such declarations, made under such circumstances, are not admissible, is held by many authorities which seem to be better supported by reason than those taking a contrary view. Railroad Co. v. Huntley, 38 Mich. 543 [31 Am. Rep. 321]; Darrigan v. Railroad Co., 52 Conn. 291 [52 Am. Rep. 590]; Jones v. Village of Portland [88 Mich. 598] 50 N. W. 733 [16 L. R. A. 437]; Railway Co. v. Roalefs [16 C. C. A. 601] 70 Fed. 21; Lambertson v. Traction Co. [60 N. J. Law, 452] 38 Atl. 683; Abbott v. Seath, 84 Wis. 320 [54 N. W. 574]; Stone v. Railway Co., 88 Wis. 98 [59 N. W. 457]; Keller v. Town of Gilman, 93 Wis. 9 [66 N. W. 800]; Laughlin v. Railway Co., 80 Mich. 154 [44 N. W. 1049]. This point was not decided by this court in Wheeler v. Railway Co., 91 Tex. 356 [43 S. W. 876], a decision of it being expressly waived because the court held that the objections urged in the trial court did not raise it. For a very similar reason it must be held that the point is not properly raised in this case. The authorities referred to admit that exclamations, shrinkings, and other expressions of a party which appear to be the instinctive or spontaneous betrayal of pain are admissible, although they be made under circumstances such as are disclosed here. Nearly all of the statements of Dr. Field of the acts and expressions of plaintiff belong to this class, and the manner in which his evidence is stated in the statement of facts makes it doubtful if the declaration of pain in the back was not produced by manipulations or tests applied by the physician. The bill of exceptions states that a general objection was made to anything that plaintiff said or did before the witness had given any testimony. This was not the proper time to raise such an objection."

[1] And so again, our highest court has failed to decide the question, and leaves the matter to be determined by this court. There is no question, in our minds, that the statements of Dr. Nash with reference to the statement of Mrs. Stephens that she had been in perfect health for 8 or 10 years, and had missed her monthly period before the accident something like 3 or 4 months, and since her injury her monthlies are regular,

but suffers with more or less pain in her hips, back, and lower abdomen, was inadmissible and incompetent for the reason that the same was hearsay and was self-serving on the part of appellee, and made long subsequent to the filing of this suit, and we believe that the better and safer rule being as we have stated, that this testimony should not have been admitted.

[2] The second assignment is as follows: "The court erred, to the prejudice of defendant, in permitting the plaintiff to offer and introduce in evidence interrogatory No. 10, propounded by plaintiff to his witness C. C. Nash, and the answer to said interrogatory, which answer was as follows: 'My opinion would be that she did. From the condition I found the female organ in, and from the history of the case that she related to me, weak spells, fainting spells, following, with the pains in her lower abdomen, and backache, led me to form the conclusion that she had suffered a miscarriage. Those are the proper symptoms of miscarriage.'"

The objection is urged that it was manifest from the answer that witness simply based his opinion, as contained in said answer, upon statements made to him by plaintiff's wife relative to the manner in which she was affected by the claimed injuries, and also based his opinion upon such statements made to him by plaintiff's wife as the cause of said injury, and therefore said answer of said witness was but hearsay on his part, and was but the reproduction through him of self-serving statements and declarations made by plaintiff's wife long subsequent to the date of her claimed injuries, and detailing in many respects the immediate effects of said injury upon her at the time thereof, and also because such statements to said witness by plaintiff's wife made long subsequent to the filing of this suit, and at a time when she was prompted by every reason and motive to falsify, all of which was fully objected to at the time said answer was offered, as is shown by defendant's bill of exceptions herein.

This assignment is followed by this proposition:

"Testimony by a medical expert to the effect that in his opinion the complaining party suffered a miscarriage as the result of an injury which she claimed to have received, which opinion is based partly, if not wholly, upon hearsay, and self-serving statements made to such witness by the complaining party as to her previous condition of health, regularity of functions, and pain and suffering, is inadmissible, and prejudicial to defendant, and the admission of such testimony was error reasonably calculated to cause and reasonably and probably causing the rendition of an erroneous verdict."

We are of opinion that the testimony was inadmissible, and should have been excluded. Wheeler v. Tyler Southeastern Ry. Co., 41 S. W. 517; Id, 91 Tex. 356, 43 S. W. 876; St. Louis S. W. Ry. Co. of Texas v. Martin, 26 Tex. Civ. App. 231, 63 S. W. 1089; Railway Co. v. Johnson, 95 Tex. 409, 67 S. W. 768; Texas State Fair v. Marti, 30 Tex. Civ. App. 132, 69 S. W. 432; Railway Co. v. Demsey, 40 Tex. Civ. App. 398, 89 S. W. 786; Railway Co. v. Boyer, 44 Tex. Civ. App. 311, 97 S. W. 1070; Railway Co. v. Hays, 62 Tex. Civ. App. 369, 131 S. W. 416; Railway Co. v. Culver, 168 S. W. 514; Railway Co. v. McKinnell, 171 S. W. 1091, 173 S. W. 937; Jones v. Village of Portland, 88 Mich. 598, 50 N. W. 731, 16 L. R. A. 437; Railway Co. v. Carr, 170 Ill. 478, 48 N. E. 992; Shaughnessy v. Holt, 236 Ill. 485, 86 N. E. 256, 21 L. R. A. (N. S.) 826; Chemical Co. v. Davis, 166 Ala. 471, 52 South. 35; Cole v. City of East St. Louis, 158 Ill. App. 494; Railway Co. v. Scalf, 155 Ky. 273, 159 S. W. 894; Railway Co. v. Bostic, 121 Ark. 295, 180 S. W. 988, 181 S. W. 135; Railway Co. v. Jackson (Okl.) 162 Pac. 823; Railway Co. v. Johnson, 95 Tex. 409, 67 S. W. 768.

The third assignment complains of error in the trial court, to the prejudice of defendant, in permitting the plaintiff to offer and introduce in evidence, over the objection of defendant, interrogatory No. 13, propounded to plaintiff's witness, Dr. C. C. Nash, and the answer thereto, said answer being as follows: "It might be, and very likely would be"—for the reason that it was and is manifest from said interrogatory that the same called for an opinion of said witness regarding the cause, manner, and extent of the injury claimed to have been received by plaintiff's wife, which opinion was based upon statements and declarations made to said witness by plaintiff's wife as to the cause, manner, and extent of her claimed injuries, and therefore the witness' answer to same would be and was but hearsay on his part; said answer to said interrogatory being also duly objected to by defendant at the time it was offered on the ground that the same was but the opinion of said witness Dr. Nash, based upon statements and declarations made to him by plaintiff's wife long subsequent to the date of her claimed injuries as to the cause, manner, and extent thereof, and long subsequent to the filing of this suit, and at a time when every reason and motive existed on the part of plaintiff's wife to falsify, both as to the cause, manner, and extent of said injuries, and it is manifest from said interrogatory and said answer, taken together, that the opinion of the witness as to the extent and effect of said injuries is based very largely, if not wholly, upon statements and declarations so made to him by plaintiff's wife, all of which was improper, incompetent, and inadmissible testimony, as is more fully shown by defendant's bill of exceptions.

The bill of exceptions shows that among other interrogatories propounded to the witness Nash was interrogatory No. 13, reading as follows:

"If, in answer to the foregoing question, you have said that said injury or affection that you found said female organs of Mrs. Stephens suffering with could have been brought about and caused by such injury she received in the passenger car at Liberty, and as the result thereof, then please state whether or not, in your opinion, judging from the history of the

case as you have testified about herein, and also from the symptoms that you observed, whether or not said affected condition of the female organs of Mrs. C. Stephens was brought about or caused by said injury; and whether or not said affection is the result of said injury. Answer very fully."

Defendant duly excepted to such interrogatory, on the ground that the same called for the opinion of said witness based largely upon what plaintiff's wife had told said witness regarding the cause of said injury, and the extent thereof, and that to permit the same with the answer thereto would be virtually and in effect to permit said witness to say to the jury by the answer to said question that in his opinion plaintiff's wife was injured on defendant's train at the time and in the manner claimed by her, because she so stated to said witness, and that in his opinion plaintiff's wife suffered a miscarriage, as claimed by her, because, among other things, she so stated to said witness, all of which would be to permit said witness to virtually say to the jury that he (witness) believed that plaintiff's wife was injured on defendant's train, as claimed by her, because she told said witness so, and that plaintiff's wife suffered a miscarriage, as claimed by her, because she told witness so. But the court overruled said objection to said interrogatory, and permitted the answer thereto to be read to the jury, over the objection of defendant, which answer was as follows: "It might be, and very likely would be"—to all of which answer said defendant duly excepted, on the ground that same was but the opinion of said witness, based at least largely upon what plaintiff's wife told witness as to the cause and extent of her said injuries, and therefore the same was hearsay testimony as to said witness, and was but the reproduction through said witness of a self-serving declaration made by plaintiff's wife, and therefore clearly inadmissible and prejudicial.

The proposition under this assignment is: "Testimony by a medical expert to the effect that in his opinion the complaining party suffered an affected condition of her female organs as the 'result of an injury which she claimed to have received, which opinion is based partly, if not wholly, upon hearsay and self-serving statements made to such witness by the complaining party, as to her previous condition of health, regularity of functions, and pain and suffering, is inadmissible, and prejudicial to defendant, and the admission of such testimony was error, calculated to cause and reasonably and probably causing the rendition of an erroneous verdict."

Having expressed our opinion, as before stated, with reference to the introduction of the above and similar testimony, and believing that the same is in principle unsound, and that the same should not be admitted, and further believing that the testimony was highly prejudicial, we sustain this assignment.

The fourth and fifth assignments of error will be considered in connection, and same are as follows:

"(a) The court erred, to the prejudice of defendant, in permitting the plaintiff to offer and introduce in evidence over the objection of defendant duly and timely made interrogatory No. 15, and the answer thereto, propounded by plaintiff to his witness, C. C. Nash, and the answer to said question, which answer was as follows: 'It is hard to say how long her present condition will last, and would expect her to remain in bad health for maybe 3 or 4 years after change of life, or maybe the balance of her life. The injury would be probably more or less permanent.' It was error to permit said answer to be introduced in evidence, because it was manifest and apparent from the interrogatory calling therefor that the opinion of said witness, as reflected by said answer was and is based largely, if not wholly, upon statements and declarations made to him by plaintiff's wife regarding the cause, manner, and extent of her claimed injuries, and made at a time, too, long subsequent to the filing of said suit, and when every reason and motive prompted her to falsify, and to permit said answer of said witness to be introduced in evidence was in effect to reproduce through him self-serving statements and declarations made to him by plaintiff's wife long subsequent to the date of her claimed injuries regarding the cause, manner, and extent thereof.

"(b) The court erred, to the prejudice of defendant, in permitting plaintiff to offer and introduce in evidence, over the objection of defendant duly and timely made, interrogatory No. 17, propounded by plaintiff to his witness, Dr. C. C. Nash, and the answer thereto, which answer was as follows: 'In my opinion the affectations would be brought about by the injuries. I did find the female organs affected, and, in my opinion, were brought about by the injuries she received; taking into consideration the history of the case.'"

The propositions are:

"(a) Testimony by a medical expert to the effect that in his opinion the complaining party would probably remain in bad health for 3 or 4 years after change of life as the result of the alleged injury, and that the injury would be probably more or less permanent, which opinion is based partly, if not wholly, upon hearsay and self-serving statements made to such witness by the complaining party, as to her previous condition of health, regularity of functions, and pain and suffering, is inadmissible, and prejudicial to defendant, and the admission of such testimony was error, calculated to cause and reasonably and probably causing the rendition of an erroneous verdict.

"(b) Testimony by a medical expert to the effect that in his opinion the complaining party did suffer affections of the female organs which were brought about by the injury she received, which opinion is based partly, if not wholly, upon hearsay and self-serving statements made to such witness by the complaining party, as to her previous condition of health, regularity of functions, and pain and suffering, is inadmissible and prejudicial to defendant, and the admission of such testimony was error, reasonably calculated to cause and reasonably and probably causing the rendition of an erroneous verdict."

[3] Both of these assignments are well taken, and must be sustained. However, with reference to the testimony of Dr. Nash, we are confronted with the proposition that if it was error, that the error was harmless, and further, that because, without objection by plaintiff in error, Dr. Sinclair had already

testified and Dr. Armstrong had already testified, and that Mrs. Stephens had already testified, and that, therefore, the admission of improper testimony against a party who has already, or after the admission of the alleged erroneous testimony, offered the same kind and character of testimony, it is harmless. The Supreme Court, in the case of Baker v. Mutual Life Insurance Co., 89 Tex. 263, 34 S. W. 604, uses the following language:

"The applicant for the writ of error recovered judgment in the district court against the defendant in error. On appeal the Court of Civil Appeals reversed the judgment, and remanded the cause. The judgment having been reversed, the question to be determined is whether this court has jurisdiction or power to grant the writ. The applicant predicates the jurisdiction of this court to grant the writ upon the following proposition, to wit: 'That the decision of the Court of Civil Appeals in reversing the judgment herein upon the assignments of error establishes the rule that the erroneous admission of evidence, when objected to by defendant, is reversible error, notwithstanding the same facts have been fully proven by defendant's own witnesses without objection, thereby overruling decisions of this court, of the Court of Civil Appeals, and of the court rendering the decision in this cause,' citing the cases. The Court of Civil Appeals reversed and remanded this cause because the court below admitted in evidence (the trial being had before a jury) illegal testimony of a material and substantial nature upon one of the most important issues in the case, concerning which the conflicting evidence was evenly balanced; that, as it did not appear that this improper testimony did not or could not have operated to the prejudice of appellant, its admission was reversible error. We do not think the decision of the Court of Civil Appeals in any manner conflicts with or overrules any of the decisions of this court or of the Court of Civil Appeals cited in the application for the writ of error, as contended for."

The Supreme Court has thus held that when testimony has been illegally admitted, over the objection of appellant, that although the same facts have been fully proved by defendant's own witnesses, without objection, if the testimony was upon issues material and important in the case, and upon which there was conflicting evidence, which was evenly balanced, that the admission of the improper evidence was cause for reversal, and the identical question having been passed upon by the Supreme Court, we hold in this case that the admission of the evidence of Dr. Nash was not only improper, and should not have been admitted over the objection of appellant, but the same was highly prejudicial, and most material, and this court could not say but what it was a decisive factor in the case. At least, it operated to the prejudice of appellant, and in this case was reversible error. Inasmuch as the case will have to be reversed and remanded, and a new trial, we think, without indicating our views any further, and as we believe that upon a proper retrial of the case in the court below, and the exclusion of the testimony complained of in this case, that there

will be a fair and impartial trial before the court, or before a jury, there will not arise again errors which may have been committed in the trial of this cause. For the errors which have been specifically set out in this case, as above, the cause is reversed and remanded.